# EXHIBIT 1



AZ Corp. Commission

04494594

AZ CORPORATION COMMISSION
FILED

DEC 1 8 2013

FILE NO. *L-1893049-8*

DO NOT WRITE ABOVE THIS LINE, FOR ACC USE ONLY

# ARTICLES OF ORGANIZATION

**Select one. This form may be used for:**

☒ **ARIZONA LIMITED LIABILITY COMPANY (A.R.S. §29-632)**

☐ **ARIZONA PROFESSIONAL LIMITED LIABILITY COMPANY (A.R.S. §29-841.01)**

**1.**    **The name of the organization:**

**A.** _____
LLC Name Reservation File Number (if one has been obtained). If not, leave this line blank

**B.**   Diego Pops, LLC
Limited Liability Company Name

**2.**    **Known place of business in Arizona.** (If address is the same as the street address of the statutory agent, write "same as statutory agent". **DO NOT LEAVE THIS SECTION BLANK.**)

Address   7328 E. Stetson Dr.

City   Scottsdale     State   Arizona     Zip   85251

**3.**    **The name and street address of the statutory agent in Arizona.**

Name   Brooks J. Holcomb, PLLC

Address   3103 S. Fairfield Dr.

City   Tempe     State   Arizona     Zip   85282

**Acceptance of Appointment by Statutory Agent:**

I,   Brooks J. Holcomb, on behalf of the law firm of Brooks J. Holcomb, PLLC, an Arizona limited liability company, having been designated to act as Statutory Agent, hereby consent to act in that capacity until removed or resignation is submitted in accordance with the Arizona Revised Statute.

**Agent Signature:** _____

Brooks J. Holcomb, PLLC
If signing on behalf of a company, please print the company name here.

L0004
ev: 10/2008

4. **Purpose of this (Professional)** Limited Liability Company is to provide the following (professional) service(s): (Only required for a Professional LLC Company)

_____

_____

5. **Dissolution:**  The latest date of Dissolution

☐ The latest date to dissolve ____/____/_____ (please enter month, date and four digit year)

☒ The Limited Liability Company is Perpetual

6. **Manager Structure:**  (Check **one** box only) A.R.S. §29-632(5)

A.    ☐ RESERVED TO THE MEMBER(S)
      IF RESERVED TO THE MEMBER(S), YOU MAY SELECT ONLY THE MEMBER BOX FOR EACH MEMBER LISTED.

B.    ☒ VESTED IN MANAGER(S)
      IF VESTED IN THE MANAGER(S), AT LEAST ONE ENTRY BELOW MUST HAVE THE MANAGER BOX CHECKED.

Name  Chad Landau                          Name Ryan Jocque

☐ Member ☒ Manager (only if "B" is selected above)      ☐ Member ☒ Manager (only if "B" is selected above)

Address 7328 E. Stetson Dr.                Address 7328 E. Stetson Dr.

City  Scottsdale  State AZ  Zip 85251      City  Scottsdale  State AZ  Zip 85251

Name  BKN Investments, LLC                 Name _____

☒ Member ☐ Manager (only if "B" is selected above)      ☐ Member ☐ Manager (only if "B" is selected above)

Address 7328 E. Stetson Dr.                Address _____

City  Scottsdale  State AZ  Zip 85251      City _____ State__ Zip _____

Executed this  18  day of  December,  2013

Executed by: _____    Print Name   Brooks J. Holcomb

_____ Brooks J. Holcomb, PLLC
      If signing on behalf of a company, please print the company name here.

Phone Number _____    Fax Number _____

LL:0004
Rev: 10/2006

# EXHIBIT 2



# OPERATING AGREEMENT
## OF
## DIEGO POPS, LLC

This Operating Agreement (the "Agreement") for DIEGO POPS, LLC, an Arizona limited liability company (the "Company"), is effective as of March 1, 2014 (the "Effective Date"), by and among the Persons listed on Exhibit A and executing this Agreement, or a counterpart thereof, as Members of the Company, and Ryan Jocque and Chad Landau as the Managers of the Company.

### Article One
### Formation; Name and Office; Purpose; Partnership Treatment

**1.1 Formation.** Pursuant to the Arizona Limited Liability Company Act, Sections 29-601 through 29-857 of the Arizona Revised Statutes (the "Act"), the parties have formed an Arizona limited liability company effective upon the filing of the Articles of Organization of the Company (the "Articles") with the Arizona Corporation Commission, which occurred on December 18, 2013. The parties have executed this Agreement to serve as the "Operating Agreement" of the Company, as that term is defined in Section 29-601(14) of the Arizona Revised Statutes, and, subject to any applicable restrictions set forth in the Act, the business and affairs of the Company, and the relationships of the parties to one another, shall be operated in accordance with and governed by the terms and conditions set forth in this Agreement. By executing this Agreement, the current Members hereby consent to the admission to the Company of all of the Persons listed on Exhibit A and executing this Agreement. The parties agree to execute all amendments to the Articles, and to do all filings, publications and other acts as may be deemed appropriate by the Managers from time to time hereafter to comply with the requirements of the Act.

**1.2 Name and Known Place of Business.** The Company shall be conducted under the name of DIEGO POPS, LLC, and the known place of business of the Company shall be 7328 E. Stetson Dr., Scottsdale, Arizona 85251, or at such other place as the Managers may from time to time determine.

**1.3 Purpose.** The initial purpose and business of this Company shall be to hold and manage a restaurant. The Company shall have the power to do any and all acts and things related to the furtherance of such purpose. The Company may engage in other businesses only upon the unanimous approval of the Managers.

**1.4 Treatment as a Partnership for Tax Purposes.** It is the intent of the Managers that the Company shall always be operated in a manner consistent with its treatment as a partnership for federal and state income tax purposes, but that the Company shall not be operated or treated as a partnership for purposes of Section 303 of the Federal Bankruptcy Code. No Manager or Member shall take any action inconsistent with this intent.

### Article Two
### Definitions

Whenever used in this Agreement, the following terms shall have the following meanings:

**2.1** "Act" means the Arizona Limited Liability Company Act, Sections 29-601 through 29-857 of the Arizona Revised Statutes, as amended from time to time, or any corresponding provisions of succeeding law.

16923928.2

Case 2:20-ap-00169-DPC   Doc 26-2   Filed 09/21/20   Entered 09/21/20 13:28:47   Desc
Exhibit 1 to Statement of Facts   Page 5 of 85

**2.2** "Additional Capital Contributions" means the contributions made pursuant to Section 3.2.2 below.

**2.3** "Additional Member" means any Person who is a member admitted to the Company pursuant to Section 8.11 below.

**2.4** "Adjusted Book Value" means with respect to any Property, such Property's Initial Book Value with the adjustments required under this Agreement.

**2.5** "Adjusted Capital Account Balance" shall be defined as set forth in Section 4.2 below.

**2.6** "Adjusted Capital Account Deficit" means, with respect to any Interest Holder, the deficit balance, if any, in the Interest Holder's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

        (i)      the Capital Account shall be increased by the amounts which the Interest Holder is obligated to restore under this Agreement or is deemed obligated to restore pursuant to Treasury Regulations Sections 1.704-2(g)(1) and (i)(5) (*i.e.*, the Interest Holder's share of Minimum Gain and Member Minimum Gain); and

        (ii)     the Capital Account shall be decreased by the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

This definition of Adjusted Capital Account Deficit is intended to comply with Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations and shall be interpreted and applied in a manner consistent with that Regulation.

**2.7** "Affiliate" means, with respect to any Interest Holder, Member or Manager, any Person: (i) which owns more than twenty percent (20%) of the voting or economic interests in the Interest Holder; (ii) in which the Interest Holder owns more than twenty percent (20%) of the voting or economic interests; or (iii) in which more than twenty percent (20%) of the voting or economic interests are owned by a Person who has a relationship with any Interest Holder described above.

**2.8** "Agreement" means this written Operating Agreement, as originally executed and as amended from time to time. No other document or oral agreement among the Managers shall be treated as part of or superseding this Agreement unless it is reduced to writing and it has been signed by all of the Managers.

**2.9** "Bankruptcy" means (a) the voluntary filing of a petition in bankruptcy or petition pursuant to any insolvency act; (b) the making of an assignment for the benefit of such Member's creditors; (c) giving consent to the appointment of a receiver, liquidator, custodian, or trustee for the whole or any substantial part of property of the Member; (d) the voluntary filing of a petition or answer seeking or consenting to reorganization under Chapter 11 of Title 11 of the United States Code or state insolvency statutes; (e) the appointment, by order of a court of competent jurisdiction, of a receiver, liquidator, custodian, or trustee for a Member for the whole or any substantial part of such Member's property, which appointment shall not have been discharged within sixty (60) consecutive days thereafter; (f) the institution against a Member of any proceeding under Chapter 11 of Title 11 of the United States Code and any amendment or successor thereto or under any other applicable law or statute of the United States or any state (including state insolvency statutes), which proceedings have not been dismissed within sixty (60) consecutive days after the institution thereof; or (g) if an insolvency petition is filed against a Member and an order for relief is directed under Chapter 11 of

Case 2:20-ap-00169-DPC    Doc 26-2    Filed 09/21/20    Entered 09/21/20 13:28:47    Desc
Exhibit 1 to Statement of Facts    Page 6 of 85

Title 11 of the United States Code. The date of the Bankruptcy shall be the date upon which any of the foregoing events occurred.

**2.10** "Capital Account" means the capital account established at the inception of the Company and maintained in accordance with Section 1.704-1(b)(2)(iv) of the Treasury Regulations for each Member and in accordance with this Agreement.

**2.11** "Capital Contribution" means any contribution to the capital of the Company in cash and the fair market value of any other assets contributed by a Member whenever made to the Company net of any liabilities secured by the contributed property that the Company is considered to assume or take "subject to" under Section 752 of the Code.

**2.12** "Cash Flow" means, with respect to any period, the Company's gross cash receipts derived from any source whatsoever (not including Capital Contributions), reduced by the portion thereof used to pay or establish reasonable reserves for all Company expenses, including, but not limited to, debt payments and accrued interest, contingencies, proposed acquisitions and payment of indemnities pursuant to the provisions of this Agreement, all as reasonably determined by the Manager pursuant to Article Five. Cash Flow shall not be reduced by depreciation, amortization, cost recovery deductions, or similar allowances.

**2.13** "Code" means the Internal Revenue Code of 1986, as amended, or any corresponding provision of any succeeding law.

**2.14** "Company Offer Period" shall be defined as set forth in Section 8.4.2 below.

**2.15** "Conditions of Transfer" shall be defined as set forth in Section 8.9 below.

**2.16** "Declaration" shall be defined as set forth in Section 8.2 below.

**2.17** "Departed Member" shall be defined as set forth in Section 8.5 below.

**2.18** "Departed Member's Membership Interest" shall be defined as set forth in Section 8.5 below.

**2.19** "Defaulting Member" shall be defined as set forth in Section 8.6.4 below.

**2.20** "Event of Withdrawal" means those events and circumstances listed in Section 29-733 of the Act.

**2.21** "Family" shall be defined as the ancestors, lineal descendants and siblings of a Member or Interest Holder and the lineal descendants of such Member's or Interest Holder's siblings.

**2.22** "Fiscal Year" means (i) the initial period of the Company commencing with the date that the Company term commenced under Section 1.1 above through March 31st of the same year, (ii) any subsequent twelve (12) month period commencing on March 1st and ending on March 31st, or (iii) any portion of the period described in clause (ii) caused by the dissolution and termination of the Company in accordance with Article Nine of this Agreement.

**2.23** "Free Transfer Period" shall be defined as set forth in Section 8.4.7 below.

**2.24** "Incapacity" means that a person is under a legal disability declared by a court of competent jurisdiction or is so incapacitated as to make it impossible or impracticable for such person to give prompt and

Case 2:20-ap-00169-DPC    Doc 26-2    Filed 09/21/20    Entered 09/21/20 13:28:47    Desc
                    Exhibit 1 to Statement of Facts    Page 7 of 85

intelligent consideration to business matters. An individual shall be deemed incapacitated for the purpose of serving in the managerial capacity hereunder at such time as there shall be delivered to the other person or persons then serving in such capacity or, if none, to the person or persons next designated to serve in such capacity or, if none, to the persons entitled to vote for a successor Manager, an affidavit signed under oath by a duly licensed physician certifying that he has examined such person and, based on such examination, that it is his opinion that it is impossible or impractical for such person to give prompt and intelligent consideration to business matters. The date of Incapacity shall be the date of the judicial determination or the date of the physician's affidavit, as the case may be.

**2.25** "Initial Book Value" means, with respect to any Property contributed to the Company by an Interest Holder, such Property's fair market value at the time of contribution and, with respect to all other Property, such Property's adjusted basis for federal income tax purposes at the time of acquisition by the Company.

**2.26** "Interest" means a Person's share of the Profits and Losses (and specially allocated items of income, gain, and deduction) of, and the right to receive distributions from, the Company.

**2.27** "Interest Holder" means any Person who holds an Interest, whether as a Member or as an Unadmitted Assignee.

**2.28** "Lending Member" shall be defined as set forth in 8.6.4(b) below.

**2.29** "Majority in Interest" means one or more Members who own, collectively, more than fifty percent (50%) of the Percentage Interests held by the Members.

**2.30** "Managers" means Ryan Jocque and Chad Landau, and as otherwise provided in Article Five of this Agreement.

**2.31** "Member" means each of the parties who execute a counterpart of this Agreement as a Member and each of the parties who may hereafter become an Additional Member as defined in Section 2.3 above, but shall not mean an Unadmitted Assignee as set forth in Section 8.10 below, unless and until such time that such Unadmitted Assignee shall become an Additional Member, or otherwise admitted as a Member. To the extent that a Manager has acquired Interests in the Company, such Manager shall have all the rights of a Member with respect to such Interests, and the term "Member" as used herein shall include a Manager to the extent that the Manager has purchased or otherwise acquired such Interests in the Company.

**2.32** "Member Offer Period" shall be defined as set forth in Section 8.4.5 below.

**2.33** "Membership Rights" means all of the rights of a Member in the Company.

**2.34** "Note" shall be defined as set forth in 8.5.1 below.

**2.35** "Offer" shall be defined as set forth in Section 8.4.1(c) below.

**2.36** "Offering Members" shall be defined as set forth in Section 8.2 below.

**2.37** "Other Members" shall be defined as set forth in Section 8.2 below.

**2.38** "Percentage Interest" means, as to a Member, the percentage set forth after such Member's name on Exhibit A, as amended from time to time, and, as to an Interest Holder who is not a Member, the Per-

Case 2:20-ap-00169-DPC    Doc 26-2    Filed 09/21/20    Entered 09/21/20 13:28:47    Desc
Exhibit 1 to Statement of Facts    Page 8 of 85

centage Interest of the Member whose Interest has been acquired by such Interest Holder, to the extent that the Interest Holder has succeeded to that Member's Interest.

**2.39** "Permitted Transferee" shall be defined as set forth in Section 8.3 below.

**2.40** "Person" means and includes an individual, corporation, partnership, association, limited liability company, trust, estate, or any other legal entity, and their respective heirs, legal representatives, successors and assigns.

**2.41** "Prime Rate" shall be defined as set forth in Section 8.5.1 below.

**2.42** "Profit and Loss" means, for each Fiscal Year of the Company (or any other period for which Profit or Loss must be computed), the Company's taxable income or loss determined in accordance with Code Section 703(a), with the following adjustments:

    **(i)** all items of income, gain, loss, deduction, or credit required to be stated separately pursuant to Code Section 703(a)(1) shall be included in computing taxable income or loss;

    **(ii)** any tax-exempt income of the Company, not otherwise taken into account in computing Profit or Loss, shall be included in computing Profit or Loss;

    **(iii)** any expenditures of the Company described in Code Section 705(a)(2)(B) (or treated as such pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i)) and not otherwise taken into account in computing Profit or Loss, shall be included in computing Profit or Loss;

    **(iv)** if the Adjusted Book Value of Property differs from its adjusted basis for federal income tax purposes, then any gain or loss resulting from any taxable disposition of Property shall be computed by reference to the Adjusted Book Value of the Property disposed of rather than the adjusted basis of the Property for federal income tax purposes;

    **(v)** if the Adjusted Book Value of Property differs from its adjusted basis for federal income tax purposes, then in lieu of the depreciation, amortization, or cost recovery deductions allowable in computing taxable income or loss, the depreciation, amortization or other cost recovery deduction shall be an amount that bears the same ratio to the Adjusted Book Value of such Property as depreciation, amortization or other cost recovery deduction computed for federal income tax purposes for such period bears to the adjusted tax basis of such Property. If the Property has a zero adjusted tax basis, the depreciation, amortization or other cost recovery deduction of such Property shall be determined under any reasonable method selected by the Managers; and

    **(vi)** any items which are specially allocated pursuant to Section 4.3 of this Agreement shall not be taken into account in computing Profit or Loss.

**2.43** "Property" means all real and personal property (including cash) owned by the Company, and any improvements thereto.

**2.44** "Qualified Income Offset" shall be defined as set forth in Section 4.3.3 below.

**2.45** "Remaining Members" shall be defined as set forth in Section 8.4.1 below.

Case 2:20-ap-00169-DPC    Doc 26-2    Filed 09/21/20    Entered 09/21/20 13:28:47    Desc
Exhibit 1 to Statement of Facts     Page 9 of 85

**2.46** "Reserves" means, with respect to any Fiscal Year, funds set aside or amounts allocated during such period to reserves which shall be maintained in amounts deemed sufficient by the Managers for working capital and to pay taxes, insurance, debt service or other costs or expenses incident to the ownership or operation of the Company's business.

**2.47** "Shadow Equity Agreements" shall be defined as those agreements which grant benefits to Persons who add value to the Company that mirror or shadow actual distributions to the Members, but does not give such Person any form of Membership Rights or Interest in the Company.

**2.48** "Tax Matters Partner" shall be defined as set forth in Section 5.12 below.

**2.49** "Transfer" means, when used as a noun, any voluntary or involuntary sale, hypothecation, pledge, assignment, attachment, or other transfer, and, when used as a verb, means voluntarily or involuntarily to sell, hypothecate, pledge, assign, or otherwise transfer.

**2.50** "Transfer Closing Date" shall be defined as set forth in Section 8.4.2 below.

**2.51** "Transfer Notice" shall be defined as set forth in Section 8.4.1 below.

**2.52** "Transfer Purchase Price" shall be defined as set forth in Section 8.4.1(c) below.

**2.53** "Transferee" shall be defined as set forth in Section 8.4.1 below.

**2.54** "Transferee Offer" shall be defined as set forth in Section 8.4.1 below.

**2.55** "Transferor" shall be defined as set forth in Section 8.4.1 below.

**2.56** "Treasury Regulations" means the Treasury Regulations, including any temporary regulations, issued by the Treasury Department under the Code from time to time.

**2.57** "Unadmitted Assignee" as set forth in Section 8.10 below, means the transferee of an Interest who has not been admitted to the Company.

## Article Three
## Capital Contributions

**3.1** **Capital Accounts.** A Capital Account shall be maintained for each Interest Holder in accordance with the following provisions:

**3.1.1** An Interest Holder's Capital Account shall be credited with the amount of money contributed by the Interest Holder to the Company; the fair market value of any property contributed by the Interest Holder to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Section 752 of the Code); the Interest Holder's allocable share of Profit and items of income and gain; and the amount of Company liabilities that are treated as assumed by the Interest Holder under Treasury Regulations Section 1.704-1(b)(2)(iv)(c).

**3.1.2** An Interest Holders' Capital Account shall be debited with the amount of money distributed to the Interest Holder; the fair market value of any Property distributed to the Interest Holder (net of liabilities secured by such distributed Property that the Interest Holder is considered to assume or take subject to under Section 752 of the Code); the Interest Holder's allocable share of Loss and items of deduction; and the

Case 2:20-ap-00169-DPC    Doc 26-2    Filed 09/21/20    Entered 09/21/20 13:28:47    Desc
Exhibit 1 to Statement of Facts    Page 10 of 85

amount of the Interest Holder's liabilities that are treated as assumed by the Company under Treasury Regulations Section 1.704-1(b)(2)(iv)(c).

**3.1.3** If any Property is distributed to an Interest Holder, the Capital Accounts of all Interest Holders shall be adjusted as if the distributed Property had been sold in a taxable disposition for the gross fair market value of such Property on the date of distribution (taking into account Section 7701 of the Code) and the Profit or Loss from such disposition allocated to the Interest Holders as provided in Article Four of this Agreement.

**3.1.4** If money or other property (other than a de minimis amount) is (i) contributed to the Company by a new or existing Interest Holder in exchange for an Interest in the Company; or (ii) distributed by the Company to a retiring or continuing Interest Holder as consideration for an Interest in the Company, then, if the Managers deem such an adjustment to be necessary to reflect the economic interests of the Interest Holders, the book value of the Property shall be adjusted to equal its gross fair market value on such date (taking into account Section 7701(g) of the Code) and the Capital Accounts of all Interest Holders shall be adjusted in the same manner as if all the Property had been sold in a taxable disposition for such amount on such date and the Profit or Loss allocated to the Interest Holders as provided in Article Four of this Agreement.

**3.1.5** To the extent an adjustment to the tax basis of any Property pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the book value of Property and the Capital Account of the Interest Holders shall be adjusted in a manner consistent with the manner in which the Capital Accounts are required to be adjusted pursuant to that Regulation.

If any Interest is transferred pursuant to the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent such Capital Account is attributable to the transferred Interest. It is intended that the Capital Accounts of all Interest Holders shall be maintained in compliance with the provisions of Treasury Regulations Section 1.704-1(b), and all provisions of this Agreement relating to the maintenance of Capital Accounts or the Adjusted Book Value of Property shall be interpreted and applied in a manner consistent with that Regulation.

## 3.2 Capital Contributions.

**3.2.1 Initial Assets.** The initial assets of the Company will be set forth in Exhibit B attached hereto and by this reference made a substantive part hereof.

### 3.2.2 Additional Capital Contributions.

**(a)** If all of the Managers and the Members who own, collectively, more than eighty percent (80%) of the Percentage Interests held by the Members, at any time or from time to time, determine that the Company requires additional Capital Contributions, then each Interest Holder shall contribute its share of additional Capital Contributions. A Interest Holder's share of the additional Capital Contributions ("Additional Capital Contributions") shall be equal to the product obtained by multiplying the Interest Holder's Percentage Interest by the total additional Capital Contributions required. Within 30 days after the Managers have determined the amount of Additional Capital Contribution required, each Interest Holder shall pay such Interest Holder's share to the Company.

**(b)** Except as expressly provided in Section 3.2.2 (a) above, no Interest Holder shall be required to contribute any additional capital to the Company, and no Interest Holder shall have any personal liability for any obligation of the Company.

Case 2:20-ap-00169-DPC    Doc 26-2    Filed 09/21/20    Entered 09/21/20 13:28:47    Desc
Exhibit 1 to Statement of Facts    Page 11 of 85

**3.2.3   Default.** If any Interest Holder fails to make its Additional Capital Contribution when due (the "Defaulting Member"), the Company may exercise, on written notice to the Defaulting Member, one or more of the following remedies:

 **(a)** taking such action, at the sole cost and expense of the Defaulting Member, to obtain payment by the Defaulting Member of the portion of the Defaulting Member's Additional Capital Contribution that is in default, together with interest on that amount at the Prime Rate plus three (3) percentage points from the date that the payment was due until the date that it is paid in full;

 **(b)** permitting the Members, in proportion to their respective percentage membership interests (the "Lending Member," whether one or more), to advance the portion of the Defaulting Member's Additional Capital Contribution that is in default, with the following results:

 **(1)** the sum advanced constitutes the initial principal balance of the loan from the Lending Member to the Defaulting Member and a capital contribution of that sum to the Company by the Defaulting Member;

 **(2)** the outstanding principal balance of the loan and all accrued unpaid interest is due and payable on the tenth day after written demand by the Lending Member to the Defaulting Member;

 **(3)** the outstanding amount of the loan bears interest from the day the advance is deemed made until the date the principal balance of the loan, together with all interest accrued thereon, is repaid in full to the Lending Member at the Prime Rate in effect on the date the advance is deemed to be made, plus three (3) percentage points;

 **(4)** all distributions from the Company that would otherwise be made to the Defaulting Member shall instead be paid to the Lending Member until the principal balance of the loan and all interest accrued thereon have been paid in full;

 **(5)** the payment of the principal balance of the loan and interest accrued thereon shall be secured by a security interest in the Defaulting Member's membership interest;

 **(6)** the Lending Member shall have the right, in addition to the other rights and remedies granted to it under the Agreement or at law or in equity, to take any action, at the sole cost and expense of the Defaulting Member, that the Lending Member may deem appropriate to obtain payment by the Defaulting Member of the principal balance of the loan and all accrued unpaid interest;

 **(7)** interest shall compound on the first day of each calendar quarter that the loan is outstanding; and

 **(8)** payments by the Defaulting Member shall be applied first to accrued unpaid interest and thereafter to the outstanding principal balance of the loan.

 **(c)** exercising the rights of a secured party under the Uniform Commercial Code of the State of Arizona;

 **(d)** reducing the percentage of membership interest of the Defaulting Member in any reasonable manner selected by the Managers, which may include a dollar for dollar reduction of

Case 2:20-ap-00169-DPC Doc 26-2 Filed 09/21/20 Entered 09/21/20 13:28:47 Desc
Exhibit 1 to Statement of Facts Page 12 of 85

membership interest for the payment not made and automatic expulsion as an Interest Holder when such membership interest has been reduced to zero with the resulting increase in the percentage of membership interests of the non-Defaulting Members being treated as a membership interest with full voting rights and not as an assignee interest;

(e)     having BKN Investments, LLC provide funds replacing the payment not made and reducing the percentage of membership interest of the Defaulting Member with a dollar for dollar reduction of membership interest for the payment not made and automatic expulsion as an Interest Holder when such membership interest has been reduced to zero with the resulting increase in the percentage of membership interests of BKN Investments, LLC being treated as a membership interest with full voting rights and not as an assignee interest; and

(f)     exercising any other rights and remedies available at law or in equity.

**3.3     Withdrawal or Return of Capital Contributions.** Except as specifically provided in this Agreement, no Interest Holder shall have the right to withdraw or reduce the Capital Contributions such Interest Holder makes to the Company. Upon a dissolution of the Company or liquidation of any Person's Interest in the Company, each Interest Holder shall look solely to the Property for return of its Capital Contributions and, if the Property remaining after the payment or discharge of the debts, obligations, and liabilities of the Company is insufficient to return the Capital Contributions of each Interest Holder, no Interest Holder shall have any recourse against the Company or any Interest Holder except for gross negligence, malfeasance, bad faith, or fraud.

**3.4     Form of Return of Capital.** Under circumstances requiring a return of any Capital Contributions, no Interest Holder shall have the right to receive property other than cash except as may be specifically provided herein.

**3.5     Salary or Interest.** Except as otherwise expressly provided in this Agreement, no Interest Holder shall receive any interest, salary, or draw with respect to its Capital Contributions or its Capital Account, or for services rendered on behalf of the Company.

**3.6     Member Loans.** Any Interest Holder may make loans to the Company at such times and on such terms as are agreed upon by all of the Managers.

**Article Four**
**Allocations and Distributions**

**4.1     Allocations.**

4.1.1   Profits. After making any special allocations required under this Agreement, Profits for each Fiscal Year (and each item of income and gain entering into the computation thereof) shall be allocated among the Interest Holders (and credited to their respective Capital Accounts) in the following order and priority:

(a)     First, to the Interest Holders until the cumulative Profits allocated pursuant to this Section 4.1.1(a) are equal to the cumulative Losses, if any, previously allocated to the Interest Holders pursuant to Section 4.1.2(b) and Section 4.1.2(c) for all prior periods in proportion to the Interest Holders' respective shares of the Losses being offset; and

(b)     Thereafter, the balance to the Interest Holders, *pro rata* in accordance with

Case 2:20-ap-00169-DPC    Doc 26-2    Filed 09/21/20    Entered 09/21/20 13:28:47    Desc
                Exhibit 1 to Statement of Facts    Page 13 of 85

their respective Percentage Interests.

4.1.2 <u>Losses</u>. After making any special allocations required under this Agreement, Losses for each Fiscal Year (and each item of loss and deduction entering into the computation thereof) shall be allocated among the Interest Holders (and charged to their respective Capital Accounts) in the following order and priority:

(a) First, to the Interest Holders, an amount equal to (or in proportion to, if less than) the excess, if any of the cumulative amount of Profits previously allocated to such Interest Holder pursuant to <u>Section 4.1.1(b)</u> over the cumulative amount of Losses previously allocated to such Interest Holder pursuant to this <u>Section 4.1.2(a)</u>; and

(b) Thereafter, the balance to the Interest Holders, *pro rata* in accordance with their respective Percentage Interests.

(c) Losses allocated pursuant to this <u>Section 4.1.2</u> shall not exceed the maximum amount of Losses that can be so allocated without causing an Adjusted Capital Account Balance deficit with respect to such Capital Account. This limitation shall be applied individually with respect to each Interest Holder in order to permit the allocation pursuant to this paragraph of the maximum amount of Losses permissible under Regulations §1.704-1(b)(2)(ii)(d). All Losses in excess of the limitation set forth in this paragraph shall be allocated solely to those Interest Holders that bear the economic risk for such additional Losses within the meaning of Code §704(b) and the Regulations thereunder. If it is necessary to allocate Losses under the preceding sentence, then the Managers shall, in accordance with the Regulations promulgated under Code §704(b), determine those Interest Holders that bear the economic risk of such additional Losses.

**4.2    Adjusted Capital Account Balance.** "Adjusted Capital Account Balance" shall mean, as of any date, an Interest Holder's total Capital Contributions less all amounts actually distributed to the Interest Holder pursuant to Section 4.5 below. If an Interest has been granted to a new or existing Interest Holder in exchange for services rendered to the Company, the Adjusted Capital Account Balance of each Interest Holder shall be adjusted (immediately prior to such issuance) to equal the amount that would be distributable to such Interest Holder if all of the Property were sold in a taxable disposition for its fair market value and the Profit or Loss allocated to the Interest Holders as provided in this Article Four. If any Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Adjusted Capital Account Balance of the transferor to the extent the Adjusted Capital Account Balance relates to the Interest transferred.

**4.3    Loss Limitations.**

**4.3.1    Qualified Income Offset.** If an Interest Holder unexpectedly receives an adjustment, allocation, or distribution described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5), or (6), then to the extent required under Treasury Regulations Section 1.704-1(b)(2)(d), such Interest Holder shall be allocated items of income and gain of the Company (consisting of a pro rata portion of each item of Company income, including gross income and gain for that Fiscal Year) before any other allocation is made of Company items for that Fiscal Year, in the amount and in proportions required to eliminate the Interest Holder's Adjusted Capital Account Deficit as quickly as possible. This Section 4.3.3 is intended to comply with, and shall be interpreted consistent with, the "qualified income offset" provisions of the Treasury Regulations promulgated under Code Section 704(b).

Case 2:20-ap-00169-DPC    Doc 26-2    Filed 09/21/20    Entered 09/21/20 13:28:47    Desc
Exhibit 1 to Statement of Facts    Page 14 of 85

**4.4    Section 704(c) Allocations; Contributed Property.**  In accordance with Code Section 704(c) and the Treasury Regulations thereunder, as well as Treasury Regulations Section 1.704-1(b)(2)(iv)(d)(3), any income, gain, loss, and deduction with respect to any property contributed (or deemed contributed) to the Company shall, solely for tax purposes, be allocated among the Interest Holders so as to take account of any variation between the adjusted basis of the property to the Company for federal income tax purposes and its fair market value at the date of contribution (or deemed contribution) in a manner reasonably determined by the Managers.  Absent notice to the contrary, the Managers shall apply the Traditional Method as defined under Regulations Section 1.704(3)-b.  Allocations pursuant to this <u>Section 4.4</u> are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses or other items or distributions pursuant to any other provision of this Agreement.

**4.5    Distributions.**

4.5.1    <u>Distributions of Cash Flow</u>.  Except as provided in <u>Section 4.5.2</u> (in connection with a Tax Distribution) or <u>Section 9.2</u> (in connection with the dissolution of the Company), distributions of Cash Flow shall be made quarterly (or more often as the Managers shall determine), to the Members, *pro rata* in accordance with their respective Percentage Interests.

4.5.2    <u>Tax Distribution</u>.

(a)    <u>Making a Tax Distribution</u>.  To the extent of Cash Flow, the Managers may, at their discretion, make quarterly distributions to each Interest Holder in an amount intended to enable each Interest Holder to discharge such Interest Holder's United States federal, state and local tax liabilities (including estimated income tax liabilities and tax on net investment income) arising from allocations of taxable income of the Company (including any taxable income subject to the application of Code §704(c)), to the Interest Holder for which such an allocation is required (a "<u>Tax Distribution</u>"); *provided, however* that any such Tax Distribution shall be subject to the Manager's reasonable discretion as well as any restrictions that may be imposed upon the Company by third-party lenders.

(b)    <u>Amount of Tax Distribution</u>.

(i)    In determining the amount of any Tax Distribution, it shall be assumed that the items of Profits, Losses, income, gain, deduction, loss, expense and credit in respect of the Company were the only such items entering into the computation of tax liability of the Interest Holder for the Fiscal Year in respect of which the Tax Distribution is made.

(ii)    In addition, in determining the amount of any Tax Distribution, it shall be assumed that the Interest Holders were subject to tax at an effective rate equal to forty-five percent (45%); provided, however that the Managers shall be authorized to make applicable adjustments to the forty-five percent (45%) figure specified above to take into consideration (i) the applicability of capital gains tax rates (to the extent that all or a portion of the taxable income of the Company constitutes capital gains), (ii) adjustments (positive or negative) in the federal and state income tax rates, or other applicable taxes, imposed on Members from those prevailing as of the date of this Agreement, (iii) the filing by the Company of a composite, combined, or aggregate tax return in any taxing jurisdiction whereby income taxes of the Members are paid directly by the Company, and (iv) the payment of any taxes by the Company that are not reflected as deductions or losses in determining the taxable income of the Company.

Case 2:20-ap-00169-DPC    Doc 26-2    Filed 09/21/20    Entered 09/21/20 13:28:47    Desc
Exhibit 1 to Statement of Facts    Page 15 of 85

(c)    <u>Limitations on Tax Distributions.</u> The amount to be distributed to an Interest Holder as a Tax Distribution in respect of any Fiscal Year shall be computed as if any distributions made pursuant to <u>Section 4.5.1</u> during such Fiscal Year were a Tax Distribution in respect of such Fiscal Year. If, upon liquidation of the Company, any Member has received more distributions by virtue of this <u>Section 4.5.2</u> than such Interest Holder otherwise would have been entitled without regard to this <u>Section 4.5.2</u>, then such Interest Holder shall be obligated to contribute to the Company the deficit balance in such Interest Holder's Capital Account, or such excess distributions, whichever is less.

(d)    <u>Effect of Tax Distributions.</u> Any distribution made pursuant to this <u>Section 4.5.2</u> shall be considered an advance against the next distribution(s) payable to the applicable Interest Holder pursuant to <u>Section 4.5.1</u> or <u>Section 9.2</u>, and shall reduce such distribution(s) on a dollar-for-dollar basis.

## 4.6    General.

**4.6.1    Form of Distribution.** In connection with any distribution, no Interest Holder shall have the right to receive Property other than cash except as may be specifically provided herein. If any Property is distributed in kind to the Interest Holders, such Property shall be valued on the basis of its fair market value, and any Interest Holder entitled to such Property shall receive its share as a tenant-in-common with all other Interest Holders so entitled. Unless the Interest Holders otherwise agree, the fair market value of such Property shall be determined by an independent appraiser who shall be selected by the Managers.

**4.6.2    Withholding.** All amounts required to be withheld pursuant to Code Section 1446 or any other provision of federal, state, or local tax law shall be treated as amounts actually distributed to the affected Interest Holders for all purposes under this Agreement.

**4.6.3    Retention of Member's Pro-Rata Distribution.** If any Interest Holder shall be indebted to the Company, then, until payment of such amount by the indebted Interest Holder, the Managers, may in their sole and absolute discretion, retain the indebted Interest Holder's pro rata share of any distribution and apply the same against the indebtedness of such Interest Holder to the Company.

**4.6.4    Varying Interests; Distributions and Allocations in Respect to Transferred Interests.** Profits, Losses, and other items shall be calculated on a monthly, daily, or other basis permitted under Code Section 706 and the Treasury Regulations thereunder. If any Interest is sold, assigned, or otherwise transferred during any accounting period in compliance with the provisions of this Agreement, Profits, Losses, each item thereof, and all other items attributable to such Interest for such period shall be divided and allocated between the transferor and the transferee by taking into account their varying interests during the period in accordance with Code Section 706(d), using any conventions permitted by law and selected by the Managers. All distributions on or before the date of the Transfer shall be made to the transferor, and all distributions thereafter shall be made to the transferee. Solely for purposes of making such allocations and distributions, the Company shall recognize the Transfer not later than the end of the calendar month during which it is given notice of the Transfer; provided, however, that if the Company does not receive a notice stating the date such Interest was Transferred and such other information as it may reasonably require within 30 days after the end of the Fiscal Year during which the Transfer occurs, then all of such items shall be allocated, and all distributions shall be made, to the Member who, according to the books and records of the Company, on the last day of the Fiscal Year during which the Transfer occurs, was the owner of the Interest. Neither the Company nor any Interest Holder shall incur any liability for making allocations and distributions in accordance with the provisions of this Section 4.6.3, whether or not any Interest Holder or the Company has knowledge of any Transfer of ownership of any Interest.

**4.6.5    Non-Recourse Liabilities.** For purposes of Treasury Regulations Section 1.752-3(a)(3) relating to the allocation of non-recourse liabilities of the Company among Interest Holders for purposes of allocating non-recourse deductions, each Interest Holder's share of Profits of the Company shall be in accordance with such Interest Holder's respective Percentage Interest. For purposes of Treasury Regulations Section 1.704-2, allocations of income, gain, Loss, deduction and expenditure attributable to non-recourse liabilities also shall be allocated among Interest Holders in accordance with their respective Percentage Interests.

**4.7    General.** Except as specifically stated to the contrary, references in this <u>Article Four</u> to the term "Member" shall include an "Interest Holder."

**Article Five**
**Rights and Duties of Manager**

**5.1    Management.** The business and affairs of the Company shall be managed exclusively by its designated Managers, who may hire a management company to handle the Company's day-to-day operations, as set forth in Section 5.15 below. Except for situations in which the approval of the Members is expressly required by this Agreement or by non-waivable provisions of applicable law, the consent of two (2) Managers shall be sufficient to make any and all decisions and to do any and all things which the Managers deem to be reasonably required to accomplish the business and objectives of the Company and shall direct, manage and control the business of the Company to the best of their ability. No Member, in his capacity as a Member, shall have the authority to act for or bind the Company.

**5.2    Initial Managers; Tenure and Number.** The initial Managers of the Company shall be Ryan Jocque and Chad Landau. Each Manager shall hold office until resignation, removal, death or Incapacity.

**5.3    Manner of Acting.** The affirmative vote of two (2) of the Managers present at a meeting, including a meeting by a conference telephone, shall be the act of the Managers. Each Manager may act without a meeting if the action taken is reduced to writing and approved and signed by another Manager.

**5.3.1**    Meetings of the Managers may be called for any purpose or purposes by a single Manager.

**5.3.2**    Written notice setting the time, date and place of the meeting and the purpose or purposes for which the meeting is called shall be delivered to each Manager not less than five (5) days before the date of the meeting, either personally or by mail, electronic mail (hereinafter "email"), facsimile, overnight, or next day delivery service, by or at the direction of the person or persons calling the meeting. If mailed, such notice shall be deemed to be delivered five (5) days after deposit in the United States Mail, postage prepaid, addressed to the Manager at the address as it appears on the books of the Company. If transmitted by email, such notice shall be deemed to be delivered on the date of such email transmission addressed to the Manager at the email address as it appears on the books of the Company. If transmitted by facsimile, such notice shall be deemed to be delivered on the date of such facsimile transmission to the fax number, if any, for the respective Manager which has been supplied to the Company and identified as such Manager's facsimile number. If transmitted by overnight or next day delivery, such notice shall be deemed to be delivered on the next business day after deposit with the delivery service addressed to the Manager at the address as it appears on the books of the Company. When a meeting is adjourned to another time or place, notice need not be given of the adjourned meeting if the time and place thereof are announced at the meeting at which adjournment is taken, unless the adjournment is for more than thirty (30) days. At the adjourned meeting, the Managers may transact any business which might have been transacted at the original meeting.

Case 2:20-ap-00169-DPC    Doc 26-2    Filed 09/21/20    Entered 09/21/20 13:28:47    Desc
Exhibit 1 to Statement of Facts    Page 17 of 85

**5.3.3** If all the Managers shall meet at any time or place, including by conference call, either within or outside the State of Arizona, and consent to the holding of a meeting at such time and place, such meeting shall be valid without call or notice.

**5.3.4** The Managers may participate and hold a meeting by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other and participation in such meeting shall constitute attendance and presence in person, except where the Manager participates in the meeting for the express purpose of objecting to the transaction of any business on the grounds the meeting is not lawfully called or convened.

**5.4** **Certain Powers of Manager**. Except as provided for below, each Manager shall have power and authority on behalf of the Company:

**5.4.1** To acquire Property from any Person as both Managers may determine. The fact that an Interest Holder is an Affiliate with any such Person shall not prohibit the Managers from dealing with that Person;

**5.4.2** To lease Property to any Person as both Managers may determine;

**5.4.3** To lend up to $25,000 (which amount may be exceeded if agreed to by both Managers) on such terms as each Manager deems appropriate and initiate foreclosure and collection actions to recover on loans in default;

**5.4.4** To borrow up to $25,000 (which amount may be exceeded if agreed to by both Managers) for the Company from banks, other lending institutions, the Members, or Affiliates of the Members, on such terms as each Manager deems appropriate, and in connection therewith, to hypothecate, encumber and grant security interests in any Property to secure repayment of the borrowed sums. No debt or other obligation shall be contracted or liability incurred by or on behalf of the Company except by the Managers.

**5.4.5** To purchase liability and other insurance to protect the Company;

**5.4.6** To hold and own any Property in the name of the Company;

**5.4.7** To invest any Company funds temporarily (by way of example but not limitation) in time deposits, short-term governmental obligations, commercial paper or other investments;

**5.4.8** To sell or otherwise dispose of all or substantially all of the Property as part of a single transaction or plan so long as both Managers consent and such disposition is not in violation of or a cause of a default under any other agreement to which the Company may be bound;

**5.4.9** To execute on behalf of the Company all instruments and documents, including, without limitation, checks, drafts, notes and other negotiable instruments, mortgages or deeds of trust, security agreements, financing statements, documents providing for the acquisition, mortgage or disposition of any Property, assignments, bills of sale, and any other instruments or documents the Managers deem to be appropriate to the business of the Company except as otherwise expressly provided in this Agreement;

**5.4.10** To employ accountants, legal counsel, managing agents or other experts to perform services for the Company and to compensate them from Company funds as each Manager deems appropriate;

**5.4.11** To make an assignment for the benefit of creditors of the Company, file a voluntary

Case 2:20-ap-00169-DPC    Doc 26-2    Filed 09/21/20    Entered 09/21/20 13:28:47    Desc
Exhibit 1 to Statement of Facts    Page 18 of 85

petition in bankruptcy or appoint a receiver for the Company so long as both Managers consent;

   **5.4.12** To enter into any and all other agreements on behalf of the Company, with any other Person for any purpose, in such form as both Managers may approve, including Shadow Equity Agreements providing economic interests; however, the payments from such agreements shall be limited to 10% of Cash Flow. For the sake of clarity, the percentage paid to shadow equity participants is intended to mirror or shadow actual distributions to the Members; and

   **5.4.13** To do and perform all other acts which the Managers deem appropriate to the conduct of the Company's business; however, notwithstanding the foregoing, each Manager has independent and unilateral authority to enter into transactions on behalf of the Company as long as each transaction does not exceed Ten Thousand Dollars ($10,000.00). Such amount may be exceeded if agreed to by both Managers.

   Unless expressly authorized to do so by this Agreement, no Interest Holder, agent, or employee of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable for any purpose.

  **5.5** **Manager Has No Exclusive Duty To Company**. Any Manager shall not be required to manage the Company as his sole and exclusive function and he may have other business interests and may engage in other activities in addition to those relating to the Company. Neither the Company nor any Member shall have any right, solely by virtue of this Agreement, to share or participate in such other investments or activities of the Manager, or to the income or proceeds derived therefrom.

  **5.6** **Bank Accounts**. All funds of the Company shall be deposited in a bank account or accounts opened in the Company's name. The Managers shall determine the institution or institutions at which the accounts shall be opened and maintained, the types of accounts, and the Persons who shall have signing authority with respect to the accounts and the funds held therein.

  **5.7** **Indemnity of the Manager**. Each Manager shall be indemnified by the Company to the fullest extent permitted by Arizona law.

  **5.8** **Resignation**. Each Manager of the Company may resign at any time by giving written notice to all of the Managers of the Company. The resignation of a Manager shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice, and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective. Such resignation shall not affect such Manager's rights and liabilities as a Member.

  **5.9** **Removal**. Any Manager may only be removed, with cause, on fifteen (15) days written notice to such Manager. The notice of removal shall set forth the grounds for removal and shall be approved by at least one (1) Manager and one or more Members who own, collectively, more than seventy-five percent (75%) of the Percentage Interests held by the Members. For purposes of this Agreement, "cause" shall mean that such Manager: (i) has been found by a court of competent jurisdiction or an arbitrator to have committed gross negligence under or willful and wanton breach of this Agreement, or committed any other act or suffered any other condition that could justify a decree of dissolution of the Company under the laws of the State of Arizona, or (ii) has been unresponsive to the Company or other Managers written correspondence (including email) for a minimum of thirty (30) days. The removal of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a withdrawal of such Manager as a Member hereunder.

  **5.10** **Vacancies**. Upon the vacancy occurring for any reason of a Manager of the Company, the vacancy shall be filled by the affirmative vote of the remaining Manager(s).

Case 2:20-ap-00169-DPC  Doc 26-2  Filed 09/21/20  Entered 09/21/20 13:28:47  Desc
Exhibit 1 to Statement of Facts  Page 19 of 85

**5.11    Salaries.** The salary and other compensation of each Manager of the Company shall be fixed from time to time by the affirmative vote of all of the Managers and a Majority in Interest of the Members, and no Manager shall be prevented from receiving such salary by reason of the fact that such Manager is also a Member of the Company.

**5.12    Tax Matters Partner.** Chad Landau shall serve as the Tax Matters Partner until his removal, resignation, death or Incapacity. At such time as Chad Landau is not serving as the Tax Matters Partner, then Ryan Jocque shall serve as the Tax Matters Partner.

**5.13    Dispute and Deadlock Resolution.** If a conflict arises between the Managers, the decision of the majority of all Managers shall control. If a decision of the majority of all Managers cannot be had, then such disputes arising under this Agreement, including, without limitation, the interpretation or enforcement of any terms or conditions of this Agreement, if not resolved through good faith negotiations between the parties, shall be submitted to mandatory, binding arbitration pursuant Article Thirteen.

**5.14    Reimbursement of Expenses.** Each Manager shall be entitled to reimbursement of reasonable out-of-pocket expenses incurred in the pursuit of the Company's business consistent with the provisions of this Agreement, which are approved by the affirmative vote of two (2) of the Managers.

## Article Six
## Rights And Obligations Of Members

**6.1    Limitation of Liability.** Each Member's liability for the debts and obligations of the Company shall be limited as set forth in Section 29-651 of the Arizona Revised Statutes and other applicable law.

**6.2    List of Members.** Upon written request of any Member, the Managers shall provide a list disclosing the names, last known addresses and Percentage Interests of all of the Members in the Company.

**6.3    Company Books.** The Managers shall maintain and preserve at the Company's known place of business, during the term of the Company, and for a period of twelve (12) months thereafter, all accounts, books, and other relevant Company documents, including, without limitation, a copy of the Articles of Organization initially filed with the Arizona Corporation Commission, a copy of any Articles of Amendment subsequently filed with the Arizona Corporation Commission, copies of this Agreement, together with any supplements, modifications or amendments hereto, any prior operating agreements no longer in effect, written agreements by a Member to make a Capital Contribution to the Company, copies of the Company's federal, state and local income tax returns, and reports and copies of all financial statements. Upon reasonable request, each Member shall have the right, during ordinary business hours, to inspect and copy such Company documents at the Member's sole expense.

**6.4    Priority and Return of Capital.** No Interest Holder with a Percentage Interest shall have priority over any other Interest Holder with a Percentage Interest, either as to the return of Capital Contributions or as to Profits, Losses or Cash Flow to the extent of each Interest Holder's respective Percentage Interest; provided however, that this Section 6.4 shall not apply to loans (as distinguished from Capital Contributions), which an Interest Holder has made to the Company. Upon the dissolution of the Company or the liquidation of such Person's Interest in the Company, each Interest Holder with a Percentage Interest shall look solely to the assets of the Company for the return of such Person's Capital Contribution to the extent of the Interest Holder's Percentage Interest. If the Property remaining after the payment or discharge of the debts, obligations, and liabilities of the Company is insufficient to return the Capital Contributions of each Interest Holder, no Interest Holder shall have any recourse against the Company, any other Interest Holder or any Manager.

Case 2:20-ap-00169-DPC    Doc 26-2    Filed 09/21/20    Entered 09/21/20 13:28:47    Desc
Exhibit 1 to Statement of Facts    Page 20 of 85

**6.5     Member Powers.** Each Member shall have the rights and powers expressly provided for under Section 29-607(B) of the Arizona Revised Statutes, but such rights and powers shall not be expanded in any way by this Agreement.

## Article Seven
## Meeting of Members

**7.1     Meetings.** Unless otherwise prescribed by the Act, meetings of the Members may be called, for any purpose or purposes, by a Majority in Interest of the Members.

**7.2     Place of Meetings.** Whoever calls the meeting may designate any place, either within or outside the State of Arizona, as the place of meeting for any meeting of the Members.

**7.3     Notice of Meetings.** Except as otherwise expressly provided in this Agreement, written notice stating the date, time, and place of the meeting, and the purpose or purposes for which the meeting is called, shall be delivered not less than three or more than fifty (50) days before the date of the meeting, either personally or by mail, email, facsimile, or overnight or next day delivery services by or at the direction of the Members calling the meeting, to each Member entitled to vote at such meeting. If mailed, such notice shall be deemed to be delivered two days after deposited in the United States mail, postage prepaid, addressed to the Member at its address as it appears on the books of the Company. If transmitted by email, such notice shall be deemed to be delivered on the date of such email transmission addressed to the Member at his email address as it appears on the books of the Company. If transmitted by way of facsimile, such notice shall be deemed to be delivered on the date of such facsimile transmission to the fax number, if any, for the respective Member which has been supplied by such Member to the Company and identified as such Member's facsimile number. If transmitted by overnight or next day delivery, such notice shall be deemed to be delivered on the next business day after deposit with the delivery service addressed to the Member at its address as it appears on the books of the Company. When a meeting is adjourned to another time or place, notice need not be given of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken, unless the adjournment is for more than thirty (30) days. At the adjourned meeting, the Company may transact any business which might have been transacted at the original meeting.

**7.4     Meeting of All Members.** If all of the Members shall meet at any time and place, including by conference telephone call, either within or outside of the State of Arizona, and consent to the holding of a meeting at such time and place, such meeting shall be valid without prior call or notice.

**7.5     Record Date.** For the purpose of determining Members entitled to notice of or to vote at any meeting of Members or any adjournment thereof, the date on which notice of the meeting is mailed shall be the record date for such determination of Members. When a determination of the Members entitled to vote at any meeting of Members has been made as provided in this Section 7.5, such determination shall apply to any adjournment thereof, unless notice of the adjourned meeting is required to be given pursuant to Section 7.3 above.

**7.6     Quorum.** A Majority in Interest of the Members, represented in person or by proxy, shall constitute a quorum at any meeting of Members. Business may be conducted once a quorum is present.

**7.7     Voting Rights of Members.** Each Member shall be entitled to vote based on its Percentage Interest. If all or a portion of an Interest is Transferred to an assignee who does not become a Member, the Member from whom the Interest is Transferred shall no longer be entitled to vote the Interest Transferred nor shall the Transferred Interest be considered outstanding for any purpose pertaining to meetings or voting. No

withdrawn Member shall be entitled to vote nor shall such Member's Interest be considered outstanding for any purpose pertaining to meetings or voting.

**7.8**    **Manner of Acting.**   Unless otherwise expressly provided in the Act, the Articles of Organization, or this Agreement, the affirmative vote of a Majority in Interest of the Members at a meeting at which a quorum is present shall be the act of the Members.

**7.9**    **Proxies.** At all meetings of Members, a Member may vote in person or by proxy executed in writing by the Member or by a duly authorized attorney-in-fact. Such proxy shall be filed with the Company before or at the time of its exercise. No proxy shall be valid after eleven (11) months from the date of its execution, unless otherwise expressly provided in the proxy.

**7.10**    **Actions by Members without a Meeting.** Any action required or permitted to be taken at a meeting of Members may be taken without a meeting if the action is evidenced by one or more written consents describing the action taken, circulated to all the Members with an explanation of the background and reasons for the proposed action, signed by that percentage or number of the Members required to take or approve the action. Any such written consents shall be delivered to the Company for inclusion in the minutes or for filing with the Company records. Action taken by written consent under this Section 7.10 shall be effective on the date the required percentage or number of the Members have signed and delivered the consent to the Company, unless the consent specifies a different effective date. The record date for determining Members entitled to take action without a meeting shall be the date the written consent is circulated to the Members, which date shall be expressly set forth in the written consent.

**7.11**    **Telephonic Communications.** Members may participate in and hold a meeting by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other, and participation in such meeting shall constitute attendance and presence in person, except where the Member participates in the meeting for the express purpose of objecting to the transaction of any business on the ground the meeting is not lawfully called or convened.

**7.12**    **Waiver of Notice.** When any notice is required to be given to any Member, a waiver thereof in writing signed by the Person entitled to such notice, whether before, at, or after the time stated therein, shall be equivalent to the giving of such notice.

**Article Eight**
**Transfers and Withdrawals**

**8.1**    **Transfers.** No Interest Holder may Transfer all, or any portion of, or any rights in, any Interest without complying with the provisions of this Article Eight. Any sale or foreclosure of a security interest shall itself constitute a Transfer independent of the grant of security. Each Interest Holder hereby acknowledges the reasonableness of this prohibition in view of the purposes of the Company and the relationship of the Interest Holders. The Transfer of any Interests in violation of the prohibition contained in this Section 8.1 shall be deemed null and void, and of no force or effect. Any Person to whom an Interest are attempted to be Transferred in violation of this Section 8.1 shall not be entitled to vote on matters coming before the Members, act as an agent of the Company, receive allocations or distributions from the Company, or have any other rights in or with respect to the Interest, as the case may be.

**8.2**    **Forced Buy-Sell.**

     8.2.1   <u>Initiating the Buy-Sell Procedure</u>. Each Member (an "<u>Offering Party</u>"), but not any Unadmitted Assignee, may notify any other Member (a "<u>Notified Party</u>"), in writing (the "<u>Offer Notice</u>") that

Case 2:20-ap-00169-DPC   Doc 26-2   Filed 09/21/20   Entered 09/21/20 13:28:47   Desc
Exhibit 1 to Statement of Facts    Page 22 of 85

the Offering Party is prepared to acquire all, but not less than all, of the Notified Party's Interests in the Company.

8.2.2    Offer Notice; Effective Date.  The Offer Notice shall be effective as of the date of its confirmed receipt (the "Notice Date").  An Offer Notice shall constitute an irrevocable offer by the Offering Party either to:

(a)    purchase from the Notified Party all, but not less than all, of the Notified Party's Interests in the Company, or

(b)    sell to the Notified Party all, but not less than all of the Offering Party's Interests in the Company.

8.2.3    Stated Value.  An Offer Notice shall specify the value of the Company (the "Company's Stated Value"), as determined by the Offering Party, which value may not necessarily equal the fair market value of the Company.

8.2.4    Response Notice.

(a)    Election to Sell or Buy.  For a period (the "Buy-Sell Period") ending on the twentieth (20th) day after the Notice Date, the Notified Party shall elect, by providing written notice (the "Response Notice"), to the Offering Party that the Notified Party elects to either:

(i)    sell the Notified Party's Interests in the Company to the Offering Party at an amount equal to the product of (x) the Company's Stated Value, *multiplied by* (y) the Notified Party's Percentage Interest, or

(ii)    purchase the Offering Party's Interests in the Company for an amount equal to the product of (x) the Company's Stated Value, *multiplied by* (y) the Offering Party's Percentage Interest.

The amount calculated in (1) or (2) above, as applicable, shall hereafter be referred to as the "Purchase Price."

(b)    Effective Date.  The Response Notice shall be effective upon the date of its submission (the "Response Notice Date").  If the Response Notice Date is not prior to the expiration of the Buy-Sell Period, then the Notified Party shall be deemed, without any further action of any other Person, to have sent a Response Notice electing to sell the Notified Party's Interests in the Company to the Offering Party as contemplated above, and such deemed Response Notice shall be deemed effective as of the last day of the Buy-Sell Period.

(c)    Closing.  The closing of the purchase and sale of the interest, as contemplated herein, shall occur on a date and time mutually agreeable to the Offering Party and the Notified Party, provided that such date shall not be later than forty-five (45) days following the last day of the Buy-Sell Period.  At the closing, the purchaser shall pay the seller in immediately available verified funds or cash, the Purchase Price.  At the closing, the Offering Party, the Noticed Party, and the Company shall execute such documents and instruments of conveyance or similar agreements reasonably requested by the other or as may be necessary or appropriate to confirm the transactions contemplated herein.

Case 2:20-ap-00169-DPC    Doc 26-2    Filed 09/21/20    Entered 09/21/20 13:28:47    Desc
Exhibit 1 to Statement of Facts    Page 23 of 85

(d)     Remedies.  In addition to any other remedies available at law or contemplated in this Agreement, if either the Offering Party or the Notified Party defaults on its obligations regarding the closing of the transaction, then the non-defaulting party shall have the right, by written notification to the defaulting party within five (5) days following such default, to either: (i) treat the default as a breach of contract and commence action for specific performance or damages; or (ii) elect to assume the position of the defaulting party as either the purchaser or the seller, as the case may be, and obtain specific performance of the contract with such party substituted as the purchaser or the seller, as the case may be.

**8.3     Permitted Transfers.**  Subject to the requirements of Section 8.9 below, a Member may Transfer all or any portion of its Interest to any of the following Persons (a "Permitted Transferee") and the Permitted Transferee shall automatically be admitted as a Member:

**8.3.1**     Any original equity holder of the Member (at the time of such Member's inception), where the Member is an entity;

**8.3.2**     Any other existing Member;

**8.3.3**     Any trust, limited liability company or another entity wholly owned by the Member;

**8.3.4**     The conservator, personal representative, or similar fiduciary of the estate of the Member, legally appointed or empowered upon or following the Member's death or incompetency, but only to the extent of a transfer to such fiduciary by operation of law as the result of such appointment or empowerment; or

**8.3.5**     A Member to whom the Interest is Transferred after the requirements of Section 8.4 below have been satisfied.

**8.4     Right of First Refusal.**

**8.4.1**     If a Member (individually, a "Transferor") after eighteen (18) months (or less if approved by the unanimous consent of the Managers) from the Effective Date receives a bona fide written offer (the "Transferee Offer") from any Person (a "Transferee") to purchase all or any portion of, or any rights in, the Transferor's Interest for a purchase price denominated and payable in United States dollars, then, prior to any Transfer of the Transferor Interest, the Transferor shall give the Members other than the Transferor (the "Remaining Members") written notice (the "Transfer Notice") containing all of the following information and documentation:

(a)     the Transferee's identity;

(b)     a true and complete copy of the Transferee Offer; and

(c)     the Transferor's offer (the "Offer") to sell the Transferor Interest to the Company, or if the Company does not accept the Offer, to the Remaining Members, for a total price equal to the price set forth in the Transferee Offer (the "Transfer Purchase Price"), which shall be payable in accordance with the payment terms set forth in the Transferee Offer.

**8.4.2**     The Offer to the Company shall be and remain irrevocable for a period (the "Company Offer Period") ending at 11:59 P.M. local time at the Company's principal office, on the 30th day following the date upon which the Transfer Notice is given to the Company. At any time during the Company Offer Period, the Company may accept the Offer by giving written notice of its acceptance. The Transferor shall not

Case 2:20-ap-00169-DPC    Doc 26-2    Filed 09/21/20    Entered 09/21/20 13:28:47    Desc
Exhibit 1 to Statement of Facts    Page 24 of 85

be deemed a Member for the purpose of the vote on whether the Company shall accept the Offer. If the Company accepts the Offer, then the Company shall fix a closing date (the "Transfer Closing Date") for the purchase, which shall not be more than 90 days after the expiration of the Company Offer Period.

**8.4.3** If the Company accepts the Offer, the Transfer Purchase Price shall be paid in accordance with the payment terms set forth in the Transferee Offer.

**8.4.4** If the Company rejects the Offer or fails to accept the Offer (within the time and in the manner specified in this Section 8.4), then the Transferor shall offer to sell the Transferor's Interest to the Remaining Members for a total price equal to the price set forth in the Transferee Offer, which shall be payable in accordance with the payment terms set forth in the Transferee Offer.

**8.4.5** The Offer shall be and remain irrevocable for a period (the "Member Offer Period") ending at 11:59 P.M. local time at the Company's principal office, on the 30th day following the date the Company Offer expired. At any time during the Member Offer Period, any Remaining Member may accept the offer by notifying the Transferor in writing that such Remaining Member intends to purchase all, but not less than all, of the Transferor's Interest. If two or more Remaining Members desire to accept the Offer, then, in the absence of an agreement between or among them, each such Remaining Member shall purchase the Transferor Interest in the proportion that his respective Percentage Interest bears to the total Percentage Interests of all of the Remaining Members who desire to accept the Offer. If one or more Remaining Members accept the Offer, then the parties shall fix a closing date for the purchase, which shall not be more than 90 days after the expiration of the Member Offer Period.

**8.4.6** If any Remaining Member accepts the Offer, the Transfer Purchase Price shall be paid in accordance with the payment terms set forth in the Transferee Offer.

**8.4.7** If no Remaining Member accepts the Offer (within the time and in the manner specified in this Section 8.4), then the Transferor shall be free for a period (the "Free Transfer Period") of 30 days after the expiration of the Member Offer Period to Transfer the Transferor Interest to the Transferee, for the same or greater price and on the same terms and conditions as set forth in the Transfer Notice. The Transfer shall be subject, however, to the Conditions of Transfer contained in Section 8.9 below. If the Transferor does not Transfer the Transferor's Interest within the Free Transfer Period, the Transferor's right to Transfer the Transferor's Interest pursuant to this Section 8.4 shall cease and terminate.

**8.4.8** Any Transfer by the Transferor after the last day of the Free Transfer Period or without strict compliance with the express terms, provisions, and conditions of this Section 8.4 and the other terms, provisions, and conditions of this Agreement, shall be null and void and of no force or effect.

**8.5 Optional Buy-Out of Membership Interest by Company.** Upon the death, divorce, Incapacity or Bankruptcy of an Interest Holder of the Company (hereinafter the "Departed Member"), the successor to the Departed Member's Membership Interest shall offer, or shall be deemed to offer, to the Company or its nominee the Interest legally or beneficially owned by the successor to the Departed Member's Membership Interest (the "Departed Member's Membership Interest"). Upon the approval of both Managers, the Company or its nominee shall have the right and option, within thirty (30) days after the death, divorce, Incapacity or Bankruptcy of the Departed Member, to acquire the Departed Member's Membership Interest for the purchase price and on the terms set forth in Section 8.7 below.

**8.5.1 Company's Payment of Buy-Out Amount.** The buy-out of the Departed Member's Membership Interest by the Company pursuant to Section 8.5 above shall be made by the execution and delivery of a promissory note (the "Note") in the principal amount equal to the Buy-Out Amount (as defined in

Case 2:20-ap-00169-DPC    Doc 26-2    Filed 09/21/20    Entered 09/21/20 13:28:47    Desc
Exhibit 1 to Statement of Facts    Page 25 of 85

Section 8.7 below). The Note shall provide for sixty (60) equal, consecutive monthly payments of principal, together with interest computed upon the unpaid principal amount at the Prime Rate, but in any event no less than five percent (5%) per year. The term "Prime Rate" shall be determined by the Western edition of the WALL STREET JOURNAL in its *Money Rates* column, or, if two interest rates are reported as the "Prime Rate," the average of the two. If for any reason the Western edition of the WALL STREET JOURNAL is not published or if such prime rate is otherwise unavailable at any time, the Managers shall select a new index or other measure appropriate as a basis for setting the interest rate in lieu thereof.

**8.5.2 Other Terms of Company's Promissory Note.** The Note shall reserve the right of the maker to prepay the indebtedness evidenced thereby, in whole or in part at any time, without penalty. The Note shall be secured by Property owned by the Company in sufficient value so that the value of the Property securing the Note is at least one hundred twenty percent (120%) of the outstanding principal of the Note. A form of the Note is attached hereto as Exhibit C.

**8.6 Optional Buy-Out of Membership Interest by Non-Departed Members.** If the Company or its nominee elects not to purchase the Departed Member's Membership Interest, then the Non-Departed Members of the Company shall have the right to purchase the Departed Member's Membership Interest pro-rata based upon their respective Percentage Interests for the purchase price and on the terms set forth in Section 8.7 below.

**8.6.1 Life Insurance.** The Members may, but shall not be required to, purchase and maintain a policy or policies of insurance on the life of the other Members to finance such Member's buy-out of a Departed Member's Membership Interest.

**8.6.2 Members' Payment of Buy-Out Amount.** The buy-out of the Departed Member's Membership Interest by the Non-Departed Members pursuant to Section 8.6 above shall be made by the execution and delivery of a promissory note in the principal amount equal to each Non-Departed Member's pro-rata share of the Buy-Out Amount (as defined in Section 8.7 below). Any promissory note executed and delivered pursuant to this Section 8.6.2 shall provide for sixty (60) equal, consecutive monthly payments of principal, together with interest computed upon the unpaid principal amount at the Prime Rate, but in any event no less than five percent (5%) per year. The term "Prime Rate" shall be determined by the Western edition of the WALL STREET JOURNAL in its *Money Rates* column, or, if two interest rates are reported as the "Prime Rate," the average of the two. If for any reason the Western edition of the WALL STREET JOURNAL is not published or if such prime rate is otherwise unavailable at any time, the Managers shall select a new index or other measure appropriate as a basis for setting the interest rate in lieu thereof.

**8.6.3 Other Terms of Non-Departed Members' Promissory Note.** The promissory note shall reserve the right of the maker to prepay the indebtedness evidenced thereby, in whole or in part at any time, without penalty. The promissory note shall be secured by such Non-Departed Member's respective Interest as of the Valuation Date (as defined in Section 8.8 below). In addition, the Non-Departed Members shall direct the Company to allow the Company's Property to secure the promissory note(s) in sufficient value so that the value of the Property securing the promissory note(s) is at least one hundred twenty percent (120%) of the outstanding principal of such promissory note(s). A form of such promissory note is attached hereto as Exhibit D.

**8.6.4 Default.** If any Member defaults on such promissory note referenced in Sections 8.6.2 and 8.6.3 above or (the "Defaulting Member"), the Company may exercise, on written notice to the Defaulting Member, one or more of the following remedies:

        (a)    taking such action, at the sole cost and expense of the Defaulting Member, to

Case 2:20-ap-00169-DPC    Doc 26-2    Filed 09/21/20    Entered 09/21/20 13:28:47    Desc
            Exhibit 1 to Statement of Facts    Page 26 of 85

obtain payment by the Defaulting Member of the portion of the Defaulting Member's Buy-Out Amount that is in default, together with interest on that amount at the Prime Rate plus three (3) percentage points from the date that the payment was due until the date that it is paid in full;

   **(b)**  permitting the Members, in proportion to their respective percentage membership interests (the "Lending Member," whether one or more), to advance the portion of the Defaulting Member's payment that is in default, with the following results:

      **(1)**  the sum advanced constitutes the initial principal balance of the loan from the Lending Member to the Defaulting Member and a capital contribution of that sum to the Company by the Defaulting Member;

      **(2)**  the outstanding principal balance of the loan and all accrued unpaid interest is due and payable on the tenth day after written demand by the Lending Member to the Defaulting Member;

      **(3)**  the outstanding amount of the loan bears interest from the day the advance is deemed made until the date the principal balance of the loan, together with all interest accrued thereon, is repaid in full to the Lending Member at the Prime Rate in effect on the date the advance is deemed to be made, plus three (3) percentage points;

      **(4)**  all distributions from the Company that would otherwise be made to the Defaulting Member shall instead be paid to the Lending Member until the principal balance of the loan and all interest accrued thereon have been paid in full;

      **(5)**  the payment of the principal balance of the loan and interest accrued thereon shall be secured by a security interest in the Defaulting Member's membership interest;

      **(6)**  the Lending Member shall have the right, in addition to the other rights and remedies granted to it under the Agreement or at law or in equity, to take any action, at the sole cost and expense of the Defaulting Member, that the Lending Member may deem appropriate to obtain payment by the Defaulting Member of the principal balance of the loan and all accrued unpaid interest;

      **(7)**  interest shall compound on the first day of each calendar quarter that the loan is outstanding; and

      **(8)**  payments by the Defaulting Member shall be applied first to accrued unpaid interest and thereafter to the outstanding principal balance of the loan.

   **(c)**  exercising the rights of a secured party under the Uniform Commercial Code of the State of Arizona;

   **(d)**  reducing the percentage of membership interest of the Defaulting Member in any reasonable manner selected by a the Managers, which may include a dollar for dollar reduction of membership interest for the payment not made and automatic expulsion as a Member when such membership interest has been reduced to zero with the resulting increase in the percentage of membership interests of the non-Defaulting Members being treated as a membership interest with full voting rights and not as an assignee interest; and

   **(e)**  exercising any other rights and remedies available at law or in equity.

10923928.2     Page 23 of 32

Case 2:20-ap-00169-DPC  Doc 26-2  Filed 09/21/20  Entered 09/21/20 13:28:47  Desc
Exhibit 1 to Statement of Facts  Page 27 of 85

**8.7     Determination of Buy-Out Amount.** The purchase price for the Departed Member's Membership Interest purchased pursuant to Sections 8.5 or 8.6 above shall be the Buy-Out Amount as of the Valuation Date (as defined in Section 8.8 below). The Buy-Out Amount shall be determined by an independent qualified business appraiser by valuing the Departed Member's Membership Interest within thirty (30) days of the death, divorce, Incapacity or Bankruptcy of the Departed Member. Such appraisal shall be arranged and paid for by the Company. If the Company fails to arrange for such appraisal within thirty (30) days, then any Member may arrange for such appraisal on behalf of the Company, with the cost of such appraisal to be borne solely by the Company. If any Member or the successor to the Departed Member's Membership Interest challenges the Buy-Out amount, then such Member or the successor to the Departed Member's Membership Interest may arrange for a second appraisal by an independent qualified business appraiser, with the cost of such appraisal being borne solely by such challenging Member or successor. The average of the two (2) appraisals shall be the Buy-Out amount.

**8.7.1** If a Member is an entity, such as a corporation or limited liability company, then for purposes of Sections 8.5 through 8.8 above the principal(s) of such entity shall be deemed to be the Member. Notwithstanding the foregoing, this Section 8.7.1 shall not apply to BKN Investments, LLC.

**8.8     Valuation Date.** The term "Valuation Date" means with respect to the purchase of the Departed Member's Membership Interest pursuant to Sections 8.5 or 8.6 above, the last day of the month immediately preceding the month in which the Departed Member died, became Incapacitated or suffers an event constituting Bankruptcy hereunder.

**8.9     Conditions of Transfer.** After satisfying the other restrictions contained in this Article Eight, under Section 8.3 a Person may Transfer all or any portion of or any rights in the Person's Interest to a Permitted Transferee only if the following conditions ("Conditions of Transfer") are satisfied:

**8.9.1** A duly executed and acknowledged written instrument of assignment is filed with the Company;

**8.9.2** The transferee agrees to be bound by the terms and conditions of this Agreement, including, without limitation, the provisions of this Article Eight;

**8.9.3** The Members and the Company are reimbursed prior to the Transfer for any reasonable expenses incurred in connection with such Transfer;

**8.9.4** The transferor and transferee agree in writing to indemnify and hold the Managers, other Members and the Company harmless for, from, and against any loss, liability, claim, or expense arising out of the Transfer;

**8.9.5** The Transfer shall not cause a termination of the Company under Section 708 of the Code; provided, however, that the requirement of this Section 8.9.5 shall be waived if the Company receives the written opinion of its attorney that such termination shall not have a material adverse effect on the Company or its Interest Holders; and

**8.9.6** The Transfer shall not require registration of Interests or Membership Rights under any federal or state securities laws.

**8.10     Rights of Unadmitted Assignees.** The Transfer of an Interest (except to a Permitted Transferee) shall not result in the Transfer of any of such transferring Member's other Membership Rights, if any, and unless the transferee is admitted as an Additional Member pursuant to Section 8.11 below, the

Case 2:20-ap-00169-DPC   Doc 26-2   Filed 09/21/20   Entered 09/21/20 13:28:47   Desc
Exhibit 1 to Statement of Facts   Page 28 of 85

transferee (an "Unadmitted Assignee") shall be entitled to receive only, to the extent transferred, the share of distributions, including distributions representing the return of Capital Contributions, and the allocation of Profits and Losses (and other items of income, gain, or deduction), to which the transferring Member would have otherwise been entitled with respect to the transferring Member's Interest. The Unadmitted Assignee shall have no right to participate in the management of the business and affairs of the Company or to become or to exercise any rights of a Member.

**8.11    Admission of Unadmitted Assignee as an Additional Member.** An Unadmitted Assignee may be admitted to the Company as an Additional Member only upon satisfaction of the conditions set forth below:

**8.11.1**  The Managers consent to such admission;

**8.11.2**  The Unadmitted Assignee becomes a party to this Agreement as a Member and executes such documents and instruments as the Managers may reasonably request as appropriate to confirm such Unadmitted Assignee as a Member in the Company and such Unadmitted Assignee's agreement to be bound by the terms and conditions of this Agreement;

**8.11.3**  The Unadmitted Assignee pays or reimburses the Company for all reasonable legal, filing, and publication costs that the Company incurs in connection with the admission of the Unadmitted Assignee as a Member with respect to the transferred Interest; and

**8.11.4**  If the Unadmitted Assignee is not an individual of legal majority, the Unadmitted Assignee provides the Company with evidence satisfactory to counsel for the Company of the authority of the Unadmitted Assignee to become a Member and to be bound by the terms and conditions of this Agreement.

**8.12    Distributions on Withdrawal.** Upon the occurrence of an Event of Withdrawal with respect to a Member, the withdrawn Member shall not be entitled to receive a withdrawal distribution but the withdrawn Member (or the withdrawn Member's successor or assigns) shall be entitled to receive the share of distributions, including distributions representing a return of Capital Contributions, and the allocation of Profits and Losses, to which the withdrawn Member otherwise would have been entitled if the Event of Withdrawal had not occurred, during the continuation of the business of the Company and during and on completion of winding up. If the Event of Withdrawal violated this Agreement, the distributions paid to the withdrawn Member shall be offset by any damages suffered by the Company or its Members as a result of the Event of Withdrawal.

**8.13    Drag-Along Rights.** In the event the Members (individually or in the aggregate) holding a majority of the Percentage Interests ("Majority Members") desire to sell their entire Percentage Interest to a third party, said Majority Members may require that each other Interest Holder transfer his, her or its Percentage Interest to said third party in the proposed sale transaction ("Sale Transaction"). Each Interest Holder shall receive in the Sale Transaction in respect of his, her or its Percentage Interest his, her or its pro-rata portion of the entire consideration to be received by all the Interest Holders in or following the Sale Transaction. The Majority Members shall notify the other Interest Holders at least ten (10) days in advance of entering into a definitive agreement in connection with the proposed Sale Transaction. In any such agreement, the other Interest Holders shall be required to make the same representations, warranties, covenants, indemnities and agreements the Majority Members agree in connection with the proposed Sale Transaction.

**Article Nine**
**Dissolution and Termination**

Case 2:20-ap-00169-DPC    Doc 26-2    Filed 09/21/20    Entered 09/21/20 13:28:47    Desc
                 Exhibit 1 to Statement of Facts    Page 29 of 85

**9.1    Dissolution.**

   **9.1.1    Events of Dissolution.** The Company shall be dissolved upon the occurrence of any of the following events:

            **(a)**    Upon the written consent of both Managers and a Majority in Interest of the Members;

            **(b)**    Upon the entry of a decree of dissolution under Section 29-785 of the Act or an administrative dissolution under Section 29-786 of the Act;

            **(c)**    Upon the sale or other disposition of all or substantially all of the Company's assets and receipt by the Company of the proceeds therefrom; or

            **(d)**    Upon the occurrence of any Event of Withdrawal of the last remaining Member as set forth in Section 29-733 of the Act, other than subparagraphs 4 or 5 thereof, unless within ninety (90) days of such Event of Withdrawal, all assignees of Interests consent in writing to admit at least one Member as provided in Section 29-731(B)(4) of the Act to continue the business of the Company.

   **9.1.2    Continuation.** An Event of Withdrawal with respect to a Member, except as provided in Section 9.1.1 above, shall not cause a dissolution, and the Company shall automatically continue following such an Event of Withdrawal.

   **9.2    Distributions and Other Matters.** The Company shall not terminate until its affairs have been wound up and its assets distributed as provided herein. Promptly upon the dissolution of the Company, the Managers shall liquidate the assets of the Company and apply and distribute the proceeds of such liquidation, or distribute the Company's assets in kind, as follows and in the following order:

   **9.2.1    Ordinary Debts.** To payment of the debts and liabilities of the Company, including debts owed to Interest Holders, in the order of priority provided by law; provided, however, that the Company shall first pay, to the extent permitted by law, liabilities with respect to which any Interest Holder is or may be personally liable;

   **9.2.2    Reserves.** To the setting up of such Reserves as the Managers deem reasonably necessary arising out of or in connection with the Company business; and

   **9.2.3    Remainder.** Thereafter, the balance, if any, to the Interest Holders in accordance with the positive balance of each Interest Holder's Capital Account as determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs, including any Capital Account adjustments associated with the allocation of Profits and Losses with respect to any sale, transfer or other taxable disposition of Company property. Any such distributions to the Interest Holders in respect of their Capital Accounts shall be made within the time requirements of Regulations §1.704-1(b)(2)(ii)(b)(2). If, for any reason, the amount distributable pursuant to this Section 9.2.3 shall be more than or less than the sum of all the positive balances of the Interest Holders' Capital Accounts, then the proceeds distributable pursuant to this Section 9.2.3 shall be distributed among the Interest Holders in accordance with the ratio by which the positive Capital Account balance of each Interest Holder bears to the sum of all positive Capital Account balances. Distributions required by Section 9.2.3 may be distributed to a trust established for the benefit of the Interest Holders for the purposes of liquidating Company property, collecting amounts owed to the Company, and paying any contingent or unforeseen liabilities or obligations of the Company or of the Managers arising out of or in connection with the Company. In such case, the assets of such trust shall be distributed to the Interest Holders from time to time, in the discretion of the Managers, in the same proportions

Case 2:20-ap-00169-DPC    Doc 26-2    Filed 09/21/20    Entered 09/21/20 13:28:47    Desc
                Exhibit 1 to Statement of Facts    Page 30 of 85

as the amount distributed to such trust by the Company would otherwise have been distributed to the Interest Holders pursuant to this Agreement.

**9.3    Deficit Capital Accounts.** Notwithstanding anything to the contrary in this Agreement, upon a liquidation within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations, if any Interest Holder's Capital Account has a deficit balance (taking into account all contributions, distributions, and allocations for the year in which a liquidation occurs), the Interest Holder shall not be obligated to make any contribution to the capital of the Company and the negative balance of such Interest Holder's Capital Account shall not be considered a debt owed by the Interest Holder to the Company or to any other Person for any purpose whatsoever.

**9.4    Rights of Interest Holders; Distributions of Property.** Except as otherwise provided in this Agreement, each Interest Holder shall look solely to the Property for the return of his Capital Contribution and shall have no right or power to demand or receive property other than cash from the Company. No Interest Holder shall have priority over any other Interest Holder for the return of his Capital Contributions, distributions, or allocations.

**9.5    Articles of Termination.** When all debts, liabilities and obligations have been paid and discharged or adequate provisions have been made therefor and all of the remaining Property has been distributed to the Members, Articles of Termination shall be executed and filed with the Arizona Corporation Commission.

## Article Ten
## Other Interests of an Interest Holder

Any Interest Holder may engage in or possess interests in any other business venture of every nature and description, independently or with others. Neither the Company nor any Interest Holder shall have any right to any independent ventures of any other Interest Holder or to the income or profits derived therefrom. The fact that an Interest Holder, a member of his Family, or an Affiliate is employed by, or owns, or is otherwise directly or indirectly interested in or connected with, any Person employed or retained by the Company to render or perform services, including, without limitation, management, contracting, mortgage placement, financing, brokerage, or other services, or from whom the Company may buy property or merchandise, borrow money, arrange financing, or place securities, or may lease real or personal property to or from the Company, shall not prohibit the Company from entering into contracts with or employing that Person or otherwise dealing with such Person and neither the Company nor any of the Interest Holders as such shall have any rights in or to any income or profits derived therefrom.

## Article Eleven
## Indemnity

**11.1    Indemnity Rights.** The Company shall indemnify each Member or Interest Holder who was or is a party or is threatened to be made a party to any threatened, pending, or completed action, suit, or proceeding, whether civil, criminal, administrative, or investigative, by reason of his actions as a Member or Interest Holder or by reason of his acts while serving at the request of the Company as a director, officer, partner, manager, employee, or agent of another corporation, partnership, limited liability company, joint venture, trust or other enterprise, against expenses, including attorneys' fees and court costs, and against judgments, fines, and amounts paid in settlement actually and reasonably incurred by him in connection with such action, suit, or proceeding, provided that the acts of such Member or Interest Holder were not committed with gross negligence or willful misconduct, and, with respect to any criminal action or proceeding, such Member or Interest Holder had no reasonable cause to believe his conduct was unlawful. The termination of any action, suit, or proceeding by judgment, order, settlement, or conviction, or upon a plea of no contest or its

Case 2:20-ap-00169-DPC    Doc 26-2    Filed 09/21/20    Entered 09/21/20 13:28:47    Desc
Exhibit 1 to Statement of Facts    Page 31 of 85

equivalent, shall not, in and of itself, create a presumption that the Member or Interest Holder acted with gross negligence or willful misconduct, or with respect to any criminal action or proceeding, had reasonable cause to believe that his conduct was unlawful.

**11.2    Notice and Defense.**  Any Member or Interest Holder who is or may be entitled to indemnification shall give timely written notice to the Company that a claim has been or is about to be made against him, shall permit the Company to defend him through legal counsel of its own choosing, and shall cooperate with the Company in defending against the claim. The Managers shall have the sole power and authority to determine the terms and conditions of any settlement of the claim.

**11.3    Other Sources.**  The indemnification provided for herein shall apply only in the event, and to the extent that, the Person is not entitled to indemnification, or other payment, from any other source (including insurance), and the Company's indemnity obligations hereunder shall be in excess of any indemnification or other payment provided by such other source.

**11.4    Survival.**  The indemnification provided for herein shall continue as to any Person who has ceased to be a Member or Interest Holder and shall inure to the benefit of the heirs, personal representatives, successors and assigns of such Person.

**Article Twelve**
**Miscellaneous Provisions**

**12.1    Notices.**  Any notice, demand, or communication required or permitted to be given by any provision of this Agreement shall be deemed to have been sufficiently given or served for all purposes if delivered personally to the party or to an executive officer of the party to which the same is directed or, if sent by registered or certified mail, postage and charges prepaid, addressed to the Managers', the Member's and/or the Company's address, as appropriate, as follows:

**12.1.1**    If to the Company:

(a)    DIEGO POPS, LLC
Attn: Manager
7328 E. Stetson Dr.
Scottsdale, Arizona 85251

**12.1.2**    If to the Managers:

(a)    Ryan Jocque
7328 E. Stetson Dr.
Scottsdale, Arizona 85251

(b)    Chad Landau
7328 E. Stetson Dr.
Scottsdale, Arizona 85251

**12.1.3**    If to the Members: Contact Company for current addresses

Except as otherwise provided herein, any such notice shall be deemed to be given three (3) business days after the date on which the same was deposited in a regularly maintained receptacle for the deposit of United States mail, addressed and sent as set forth in this Section 12.1.

16923828.2

Case 2:20-ap-00169-DPC    Doc 26-2    Filed 09/21/20    Entered 09/21/20 13:28:47    Desc
Exhibit 1 to Statement of Facts    Page 32 of 85

**12.2** **Partial Invalidity.** The invalidity of any portion of this Agreement shall not affect the validity of the remainder hereof.

**12.3** **Governing Law; Parties in Interest.** This Agreement shall be governed by and construed according to the laws of the State of Arizona without regard to conflicts of law principles and shall bind and inure to the benefit of the heirs, successors, assigns, and personal representatives of the parties.

**12.4** **Amendment.** This Agreement may only be amended, restated, or revoked only by the unanimous written consent of the Managers and a Majority in Interest of the Members.

**12.5** **Execution in Counterparts.** This Agreement may be executed in any number of counterparts with the same effect as if all of the parties had signed the same document. All counterparts shall be construed together and shall constitute one document and may be executed by the affixing of the signature of each of the parties to one of such counterpart signature pages, and all such counterpart signature pages shall be read as one and shall have the same force and effect as though all the signers had signed the same signature page.

**12.6** **Titles and Captions.** All article, section, or paragraph titles or captions contained in this Agreement are for convenience of reference only and shall not be deemed to be a substantive part of this Agreement.

**12.7** **Pronouns and Plurals.** All pronouns and any variations thereof are deemed to refer to the masculine, feminine, neuter, singular, or plural as the identity of the Person or Persons may require.

**12.8** **Waiver of Action for Partition.** Each of the Interest Holders irrevocably waives any right that he may have to maintain any action for partition with respect to any of the Property.

**12.9** **Entire Agreement.** This Agreement contains the entire understanding among the parties, and supersedes any prior understandings and agreements, oral or written, between or among them with respect to the subject matter hereof.

**12.10** **Estoppel Certificate.** Each Member shall, within ten (10) days after written request by any Member, deliver to the requesting Person a certificate stating, to the best of the Member's knowledge and belief, that:

**12.10.1** This Agreement is in full force and effect;

**12.10.2** This Agreement has not been revoked or otherwise modified or amended except by any instrument or instruments identified in the certificate; and

**12.10.3** There is no default hereunder by the requesting Person, or if there is a default, the nature and extent of such default.

**12.11** **Execution of Additional Instruments.** Each Interest Holder hereby agrees to execute such other and further statements of interest and holdings, designations, powers of attorney and other instruments necessary to comply with any laws, rules or regulations.

**12.12** **Waivers Not Indulgences.** The failure of any party to seek redress for violation of or to insist upon the strict performance of any covenant or condition of this Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original

Case 2:20-ap-00169-DPC    Doc 26-2    Filed 09/21/20    Entered 09/21/20 13:28:47    Desc
Exhibit 1 to Statement of Facts    Page 33 of 85

violation.

**12.13   Rights and Remedies Cumulative**. The rights and remedies provided in this Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive the right to use any or all other remedies. Such rights and remedies are given in addition to any other rights the parties may have by law, statute, ordinance or otherwise.

**12.14   Creditors**. None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Company.

**12.15   Investment Representations and Covenants.**

**12.15.1** Each undersigned Member hereby represents and warrants to the Company and acknowledges that: (a) such Member has knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of an investment in the Company and making an informed investment decision with respect thereto; (b) such Member has reviewed and evaluated all information necessary to assess the merits and risks of his or its investment in the Company and has had answered to such Member's satisfaction any and all questions regarding such information; (c) such Member is able to bear the economic and financial risk of an investment in the Company for an indefinite period of time; (d) such Member is acquiring Interests in the Company for investment only and not with a view to, or for resale in connection with, any distribution to the public or public offering thereof; (e) the Interests in the Company have not been registered under the securities laws of any jurisdiction and cannot be disposed of unless they are subsequently registered and/or qualified under applicable securities laws and the provisions of this Agreement have been complied with; (f) the determination of such Member to purchase Interests in the Company has been made by such Member independent of any other Member and independent of any statements or opinions as to the advisability of such purchase, which may have been made or given by any other Member or by any agent or employee of any other Member; and (g) the Interests in the Company were not offered to such Member by means of general solicitation or general advertising. In that regard, each Member has completed an Investor Questionnaire.

**12.15.2** Each Member agrees not to Transfer, sell or offer for sale any portion of his Interests unless there is an effective registration or other qualification relating thereto under the Securities Act of 1933 ("Securities Act") and under any applicable state securities laws, or unless the Member delivers to the Company an opinion of counsel, satisfactory to the Company, that such registration or other qualification under the Securities Act and applicable state securities laws is not required in connection with such Transfer, offer or sale. Each Member understands that the Company is under no obligation to register the Interests or to assist such Member in complying with any exemption from registration under the Securities Act if such Member should, at a later date, wish to dispose of the Interests. Furthermore, each Member hereby acknowledges that the Interests are unlikely to qualify for disposition under Rule 144 of the Securities and Exchange Commission unless such Member is not an "affiliate" of the Company and the Interest has been beneficially owned and fully paid for by such Member for an extended period of time. The foregoing limitations are in addition to, and do not diminish, the other limitations on Transfers set forth elsewhere in this Agreement.

Case 2:20-ap-00169-DPC   Doc 26-2   Filed 09/21/20   Entered 09/21/20 13:28:47   Desc
Exhibit 1 to Statement of Facts   Page 34 of 85

**12.16     Membership Units and Certificates.** All membership interests in the Company shall be represented by units and evidenced by Certificates of Membership Units disclosing the Members of record, the number of units held by each such Member and the date of issuance for each such Certificate.

**12.17     Endorsement on Certificates of Membership Units.** Each certificate representing membership units of the Company now or hereafter held by the Members or any other person shall contain the following legend:

> The units represented by this document have not been registered under any securities laws and may not be sold, assigned or transferred, unless (i) a registration statement under the Securities Act of 1933, as amended, with respect to such units shall then be in effect, or (ii) the availability of an exemption from such registration shall be established to the satisfaction of counsel to the Company. The units represented by this document are subject to further restriction as to their sale, transfer, hypothecation, or assignment as set forth in that certain Operating Agreement, as amended, copies of which documentation shall be furnished upon request.

**12.18     Conflicts of Interest and Disclosures.** The parties hereby acknowledge that: (i) Brooks J. Holcomb, PLLC (the "Firm") is General Counsel for BKN Investments, LLC, in connection with this Agreement and all other agreements or documents contemplated herein; (ii) that each of the other parties has been advised to seek independent counsel in connection with such matters; and (iii) that the Firm does not represent any Member or Manager, other than BKN Investments, LLC as its General Counsel. In addition, the parties hereby acknowledge that in accordance with Ethics Rule No. 1.7 of the Arizona Rules of Professional Conduct and Arizona Ethics Opinion 07-04, Brooks J. Holcomb disclosed that he has an ownership interest in BKN Investments, LLC.

**Article Thirteen**
**Arbitration**

The parties shall submit all controversies, claims and matters of difference hereunder or related hereto to arbitration according to the rules and practices of the American Arbitration Association from time to time in force, except that if the rules and practices shall conflict with the Arizona Rules of Civil Procedure or any other provision of Arizona law then in force, the Arizona rules and provisions shall govern. This submission and agreement to arbitrate shall be specifically enforceable. Without limiting the generality of the foregoing, the following shall be considered controversies for this purpose:  (a) all questions relating to the breach of any obligation, warranty or condition hereunder; (b) all questions relating to any representations, negotiations and other proceedings leading to the execution of this Agreement or any amendment thereto; (c) failure of any party to deny or reject a claim or demand of any party; and (d) all questions as to whether the right to arbitrate any question exists. Arbitration may proceed in the absence of any party if notice of the arbitration proceedings has been given to such party. The parties agree to abide by all awards rendered in the arbitration proceedings. Such awards shall be final and binding on all parties to the extent and in the manner provided by Arizona law. All awards may be filed with the clerk of one or more courts, state and federal, having jurisdiction over the party against whom an award is rendered or such party's property, as a basis of judgment and of the issuance of execution for its collection. No party shall be considered in default hereunder during the pendency of arbitration proceedings relating to any default. The sole and exclusive place of venue for any arbitration or dispute arising hereunder shall be Maricopa County, Arizona, and the Members waive any right to object thereto.

Case 2:20-ap-00169-DPC    Doc 26-2   Filed 09/21/20   Entered 09/21/20 13:28:47   Desc
                    Exhibit 1 to Statement of Facts    Page 35 of 85

## Article Fourteen
## Agreement of Spouses of Interest Holders

**14.1    Spouses Bound by Agreement.**  The spouse of each Interest Holder who is a married individual shall execute a Spousal Consent to this Agreement.  If an unmarried Interest Holder should marry during the term of this Agreement, such Interest Holder shall obtain the consent of his spouse to the terms of this Agreement within 30 days of the date of the marriage.  Any spouse executing a Spousal Consent to this Agreement hereby consents to be bound by its terms and conditions.  Pursuant to Article Eight, should an event occur which requires that an Interest Holder offer or be deemed to have offered his Interest to the Company or to the other Members, then the rights and obligations of the Interest Holder shall extend not only to the Interest actually owned by the Interest Holder but also to the Interest owned legally or beneficially by the Interest Holder's spouse and by the community of the Interest Holder and his spouse.  Each spouse of an Interest Holder hereby irrevocably authorizes the Interest Holder to make any offer required to be made under this Agreement and to take any other action authorized or required by an Interest Holder under this Agreement.

**IN WITNESS WHEREOF,** the Managers and the Members have executed this Operating Agreement as of the Effective Date set forth above.

**MANAGERS:**

*The Managers have been informed and advised to retain separate representation by legal counsel of their own choosing with respect to the execution of this Operating Agreement and have done so or declined to do so, and have read and understood this Operating Agreement in its entirety, and do hereby acknowledge that the law firm of Brooks J. Holcomb, PLLC, did not represent them in connection with the drafting or negotiation of this Operating Agreement.*

Ryan Jocque

Chad Landau

**MEMBERS:**

*The Members, have been informed and advised to retain separate representation by legal counsel of their own choosing with respect to the execution of this Operating Agreement and have done so or declined to do so, and have read and understood this Operating Agreement in its entirety, and do hereby acknowledge that the law firm of Brooks J. Holcomb, PLLC, did not represent them in connection with the drafting or negotiation of this Operating Agreement.*

BKN Investments, LLC, an Arizona limited liability company

By: _____
    Ryan Jocque, Manager

18023826.2

# OPERATING AGREEMENT

## OF

## DIEGO POPS, LLC

### Effective as of March 1, 2014

10023825.2

# DIEGO POPS, LLC

## OPERATING AGREEMENT

## TABLE OF CONTENTS

### ARTICLE ONE

### FORMATION; NAME AND OFFICE; PURPOSE; PARTNERSHIP TREATMENT

| | | |
|---|---|---|
| 1.1 | Formation | 1 |
| 1.2 | Name and Known Place of Business | 1 |
| 1.3 | Purpose | 1 |
| 1.4 | Treatment as a Partnership for Tax Purposes | 1 |

### ARTICLE TWO
### DEFINITIONS

| | | |
|---|---|---|
| 2.1 | Act | 2 |
| 2.2 | Additional Capital Contributions | 2 |
| 2.3 | Additional Member | 2 |
| 2.4 | Adjusted Book Value | 2 |
| 2.5 | Adjusted Capital Account Balance | 2 |
| 2.6 | Adjusted Capital Account Deficit | 2 |
| 2.7 | Affiliate | 2 |
| 2.8 | Agreement | 3 |
| 2.9 | Capital Account | 3 |
| 2.10 | Capital Contribution | 3 |
| 2.11 | Cash Flow | 3 |
| 2.12 | Code | 3 |
| 2.13 | Company Offer Period | 3 |
| 2.14 | Conditions of Transfer | 3 |
| 2.15 | Deceased Member | 3 |
| 2.16 | Deceased Member's Membership Interest | 3 |
| 2.17 | Defaulting Member | 3 |
| 2.18 | Distributable Cash | 3 |
| 2.19 | Event of Withdrawal | 4 |
| 2.20 | Family | 4 |
| 2.21 | Fiscal Year | 4 |
| 2.22 | Free Transfer Period | 4 |
| 2.23 | Incapacity | 4 |
| 2.24 | Initial Book Value | 4 |
| 2.25 | Initial Capital Contributions | 4 |

Case 2:20-ap-00169-DPC    Doc 26-2    Filed 09/21/20    Entered 09/21/20 13:28:47    Desc
Exhibit 1 to Statement of Facts    Page 41 of 85

# DIEGO POPS, LLC
## OPERATING AGREEMENT

## TABLE OF CONTENTS
### (Continued)

2.26 Interest ...................................................................................................... 4
2.27 Interest Holder .......................................................................................... 4
2.28 Lending Member ........................................................................................ 4
2.29 Majority in Interest ..................................................................................... 5
2.30 Manager ..................................................................................................... 5
2.31 Member ....................................................................................................... 5
2.32 Member Offer Period .................................................................................. 5
2.33 Membership Rights ..................................................................................... 5
2.34 Note ............................................................................................................ 5
2.35 Offer ............................................................................................................ 5
2.36 Percentage Interest ...................................................................................... 5
2.37 Permitted Transferee ................................................................................... 5
2.38 Person .......................................................................................................... 5
2.39 Personal Representative ............................................................................... 5
2.40 Profit and Loss ............................................................................................. 5
2.41 Property ........................................................................................................ 6
2.42 Qualified Income Offset ............................................................................... 6
2.43 Remaining Members ..................................................................................... 6
2.44 Reserves ....................................................................................................... 6
2.45 Surviving Members ....................................................................................... 6
2.46 Tax Matters Partner ...................................................................................... 6
2.47 Transfer ......................................................................................................... 7
2.48 Transfer Closing Date .................................................................................... 7
2.49 Transfer Notice .............................................................................................. 7
2.50 Transfer Purchase Price ................................................................................. 7
2.51 Transferee ...................................................................................................... 7
2.52 Transferee Offer ............................................................................................ 7
2.53 Transferor ...................................................................................................... 7
2.54 Treasury Regulations ..................................................................................... 7
2.55 Unadmitted Assignee ..................................................................................... 7

## ARTICLE THREE
## CAPITAL CONTRIBUTIONS

3.1 Capital Accounts ............................................................................................ 7
3.2 Capital Contributions ...................................................................................... 8
    3.2.1 Initial Capital Contributions ................................................................... 8
    3.2.2 Additional Capital Contributions ............................................................ 8
    3.2.3 Default ..................................................................................................... 9
3.3 Withdrawal or Return of Capital Contributions ............................................. 10

# DIEGO POPS, LLC
## OPERATING AGREEMENT

**TABLE OF CONTENTS**
**(Continued)**

3.4 Form of Return of Capital ..................................................................................................... 10
3.5 Salary or Interest ................................................................................................................... 10
3.6 Member Loans ....................................................................................................................... 10

**ARTICLE FOUR**
**ALLOCATIONS AND DISTRIBUTIONS**

4.1 Allocations ............................................................................................................................ 11
4.2 Adjusted Capital Account Balance ........................................................................................ 11
4.3 Loss Limitations .................................................................................................................... 11
    4.3.1 Adjusted Capital Account Deficit ............................................................................. 11
    4.3.2 Cash Method Limitation ............................................................................................ 11
    4.3.3 Qualified Income Offset ............................................................................................ 12
4.4 Section 704(c) Allocations; Contributed Property ............................................................... 12
4.5 Distributions .......................................................................................................................... 12
4.6 General ................................................................................................................................... 12
    4.6.1 Form of Distribution .................................................................................................. 12
    4.6.2 Withholding ................................................................................................................ 12
    4.6.3 Varying Interests; Distributions and Allocations in Respect
             to Transferred Interests .............................................................................................. 12
    4.6.4 Non-Recourse Liabilities ........................................................................................... 13

**ARTICLE FIVE**
**RIGHTS AND DUTIES OF MANAGER**

5.1 Management ........................................................................................................................... 13
5.2 Initial Manager; Tenure and Number .................................................................................... 13
5.3 Certain Powers of Manager ................................................................................................... 14
5.4 Manager has No Exclusive Duty to Company ....................................................................... 15
5.5 Bank Accounts ....................................................................................................................... 15
5.6 Indemnity of the Manager ..................................................................................................... 15
5.7 Resignation ............................................................................................................................ 15
5.8 Removal ................................................................................................................................. 15
5.9 Vacancies ............................................................................................................................... 16
5.10 Salaries .................................................................................................................................. 16
5.11 Tax Matters Partner ............................................................................................................... 16
5.12 Dispute and Deadlock Resolution ......................................................................................... 16

**DIEGO POPS, LLC**
**OPERATING AGREEMENT**

**TABLE OF CONTENTS**
**(Continued)**

**ARTICLE SIX**
**RIGHTS AND OBLIGATIONS OF MEMBERS**

| | | |
|---|---|---|
| 6.1 | Limitation of Liability | 16 |
| 6.2 | List of Members | 16 |
| 6.3 | Approval of Sale of All Assets | 16 |
| 6.4 | Approval of Merger or Consolidation | 17 |
| 6.5 | Approval of Debt | 17 |
| 6.6 | Company Books | 17 |
| 6.7 | Priority and Return of Capital | 17 |
| 6.8 | Reimbursement of Expenses | 17 |

**ARTICLE SEVEN**
**MEETING OF MEMBERS**

| | | |
|---|---|---|
| 7.1 | Meetings | 18 |
| 7.2 | Place of Meetings | 18 |
| 7.3 | Notice of Meetings | 18 |
| 7.4 | Meeting of All Members | 18 |
| 7.5 | Record Date | 18 |
| 7.6 | Quorum | 19 |
| 7.7 | Voting Rights of Members | 19 |
| 7.8 | Manner of Acting | 19 |
| 7.9 | Proxies | 19 |
| 7.10 | Actions by Members Without a Meeting | 19 |
| 7.11 | Telephonic Communications | 19 |
| 7.12 | Waiver of Notice | 20 |

**ARTICLE EIGHT**
**TRANSFERS AND WITHDRAWALS**

| | | |
|---|---|---|
| 8.1 | Transfers | 20 |
| 8.2 | Withdrawals | 20 |
| 8.3 | Permitted Transfers | 20 |
| 8.4 | Right of First Refusal | 21 |
| 8.5 | Optional Buy-Out of Membership Interest by Company | 22 |
| 8.6 | Mandatory Buy-Out of Membership Interest by Surviving Members | 23 |
| 8.7 | Determination of Buy-Out Amount | 25 |

**DIEGO POPS, LLC**
**OPERATING AGREEMENT**

Case 2:20-ap-00169-DPC    Doc 26-2    Filed 09/21/20    Entered 09/21/20 13:28:47    Desc
Exhibit 1 to Statement of Facts    Page 44 of 85

# TABLE OF CONTENTS
## (Continued)

8.8   Valuation Date ........................................................................................... 26
8.9   Conditions of Transfer .............................................................................. 26
8.10  Rights of Unadmitted Assignees ................................................................ 26
8.11  Admission of Additional Members ............................................................. 27
8.12  Additional Interests ................................................................................... 27
8.13  Distributions on Withdrawal ...................................................................... 27

## ARTICLE NINE
### DISSOLUTION AND TERMINATION

9.1   Dissolution ............................................................................................... 28
        9.1.1 Events of Dissolution ....................................................................... 28
        9.1.2 Continuation ..................................................................................... 28
9.2   Distributions and Other Matters ................................................................ 28
        9.2.1  Ordinary Debts ................................................................................ 28
        9.2.2  Reserves .......................................................................................... 28
        9.2.3  Remainder ........................................................................................ 28
9.3   Deficit Capital Accounts ........................................................................... 28
9.4   Rights of Interest Holders; Distributions of Property ................................. 29
9.5   Articles of Termination .............................................................................. 29

## ARTICLE TEN
### OTHER INTERESTS OF AN INTEREST HOLDER

Other Interests of an Interest Holder ...................................................................... 29

## ARTICLE ELEVEN
### INDEMNITY

11.1  Indemnity Rights ...................................................................................... 29
11.2  Notice and Defense ................................................................................... 30
11.3  Other Sources ............................................................................................ 30
11.4  Survival ..................................................................................................... 30

## ARTICLE TWELVE
### MISCELLANEOUS PROVISIONS

12.1  Notices ...................................................................................................... 30
12.2  Partial Invalidity ....................................................................................... 31

## DIEGO POPS, LLC
## OPERATING AGREEMENT

## TABLE OF CONTENTS
## (Continued)

12.3 Governing Law; Parties in Interest .................................................................. 31
12.4 Amendment .................................................................................................... 31
12.5 Execution in Counterparts ............................................................................. 31
12.6 Titles and Captions ........................................................................................ 31
12.7 Pronouns and Plurals ..................................................................................... 32
12.8 Waiver of Action for Partition ....................................................................... 32
12.9 Entire Agreement ........................................................................................... 32
12.10 Estoppel Certificate ....................................................................................... 32
12.11 Execution of Additional Instruments ............................................................ 32
12.12 Waivers Not Indulgences .............................................................................. 32
12.13 Rights and Remedies Cumulative .................................................................. 32
12.14 Creditors ........................................................................................................ 32
12.15 Investment Representation ............................................................................. 32
12.16 Membership Units and Certficates ................................................................ 33
12.17 Endorsement of Certificates of Membership Units ....................................... 33

**ARTICLE THIRTEEN**
**ARBITRATION**

Arbitration ................................................................................................................ 34

**EXHIBITS**

Exhibit A - Names, Addresses, Number of Units and Respective Percentage Interests
            of Members ................................................................................................ A-1

Exhibit B – Initial Capital Contributions and Property of the Company .................... B-1

Exhibit C – Form of Promissory Note for Company Buy-Out ................................... C-1

Exhibit D – Form of Promissory Note for Member Buy-Out ...................................... D-1

Case 2:20-ap-00169-DPC    Doc 26-2    Filed 09/21/20    Entered 09/21/20 13:28:47    Desc
                Exhibit 1 to Statement of Facts    Page 46 of 85

**DIEGO POPS, LLC**
**OPERATING AGREEMENT**
**dated as of March 1, 2014**

# EXHIBIT A

## NAMES, NUMBER OF UNITS AND
## RESPECTIVE PERCENTAGE INTERESTS OF MEMBERS
## AS OF MARCH 1, 2014

**MEMBERS:**

| Name | Membership Units | Membership Percentage |
|------|------------------|------------------------|
| BKN Investments, LLC | 100 | 100% |

**DIEGO POPS, LLC**
**OPERATING AGREEMENT**
**dated as of March 1, 2014**

## EXHIBIT B

### INITIAL CAPITAL CONTRIBUTIONS AND PROPERTY OF THE COMPANY
### AS OF MARCH 1, 2014

| Description of Assets by Category | Value as of 08/01/13 |
|---|---|
| **1.**    **Real Estate:** | |
|    **1.1** | $      -0- |
| **2.**    **Stocks and Bonds:** | |
|    **2.1**    None | $      -0- |
| **3.**    **Mortgages, Notes and Cash:** | |
|    **3.1**    Mortgages (notes receivable secured by real estate):  None | $      -0- |
|    **3.2**    Notes receivable (any loans evidenced by a note):  None | $      -0- |
|    **3.3**    Cash (bank accounts, credit unions, etc.): | |
|      **3.3.1**    Account no. _____ at _____ Bank, _____, Phoenix, Arizona 85___, titled in the name of DIEGO POPS, LLC, with a balance as of June ___, 2013, of $_____.00 | $      _____.00 |
| **4.**    **Miscellaneous Property:** | |
|    **4.1**    None | $      -0- |

### SUMMARY

| | | |
|---|---|---|
| 1. | Real Estate | $      -0- |
| 2. | Stocks and Bonds | $      -0- |
| 3. | Mortgages, Notes and Cash | $      _____.00 |
| 4. | Miscellaneous Property | $      -0- |
| | **TOTAL** | $      _____.00 |

**DIEGO POPS, LLC**
**OPERATING AGREEMENT**
**dated as of March 1, 2014**

# EXHIBIT C

## FORM OF PROMISSORY NOTE
## FOR COMPANY BUY-OUT

The form of Promissory Note is as follows:

### PROMISSORY NOTE

$_____                      Phoenix, Maricopa County, Arizona
                                       Dated: _____

    FOR VALUE RECEIVED, the undersigned, DIEGO POPS, LLC, an Arizona limited liability company (hereinafter called "Maker"), promises to pay to the order of _____, at _____ (together with all subsequent holders of this Note, hereinafter called "Payee"), or at such other mailing address as Payee may from time to time designate in writing, the principal sum of _____ AND 00/100 DOLLARS ($_____) plus interest at the rate of _____ per cent (\_\_%) per annum, from the date hereof on the principal balance from time to time outstanding as hereinafter provided, and all other sums payable hereunder, to be paid in lawful money of the United States of America, as follows:

        A.    Sixty (60) equal, consecutive monthly payments of accrued interest and principal of $_____ due and payable on the _____ day of each month, commencing _____, and as of the _____ day of each month thereafter; and

        B.    The entire outstanding principal and all accrued but unpaid interest shall be due and payable in full on or before _____.

    All payments on this Note shall be applied first to the payment of any costs, fees or other charges incurred in connection with the indebtedness evidenced by this Note, then to the payment of interest and principal as described above.

    Maker shall have the option to prepay this Note, in full or in part, at any time, without penalty.

C-1

## EXHIBIT C

### FORM OF PROMISSORY NOTE
### FOR COMPANY BUY-OUT

#### (Continued)

Time is of the essence of this Note. Upon the failure of Maker to pay any sum due and owing hereunder as provided herein within thirty (30) days of its due date, the Payee shall give the Maker written notice of any such default and a thirty (30) day period thereafter to cure the default (the "Curing Period"). If the Maker has not perfected a cure during the Curing Period (unless such failure cannot be reasonably cured within the Curing Period and the Maker has taken reasonable steps to cure such failure within the Curing Period and continues to pursue the curing of same until completed), at the option of Payee, the entire unpaid principal balance, all accrued and unpaid interest and all other amounts payable hereunder, shall become immediately due and payable, and the Payee may proceed against Maker in such manner as Payee, in his sole discretion, shall determine.

After maturity, including maturity upon acceleration, the unpaid principal balance, all accrued and unpaid interest and all other amounts payable hereunder, shall bear interest at that rate which is five percent (5%) above the rate that would otherwise be payable under the terms hereof. In addition, Maker shall pay all costs and expenses, including reasonable attorneys' fees and court costs, incurred in the collection or enforcement of all or any part of this Note. In the event of any court proceedings, court costs and attorneys' fees shall be set by the court and not by jury and shall be included in any judgment obtained by Payee.

Failure of Payee to exercise any option hereunder shall not constitute a waiver of its right to exercise the same in the event of any subsequent default or in the event of the continuance of any existing default after demand for strict performance hereof.

Maker, sureties, guarantors and endorsers hereof: (a) agree to be jointly and severally bound, (b) severally waive any homestead or exemption right against such debt, (c) severally waive demand, diligence, presentment for payment, protest and demand, and notice of extension, dishonor, protest, demand and nonpayment of this Note, and (d) consent that Payee may extend the time of payment or otherwise modify the terms of payment of any part or the whole of the debt evidenced by this Note, at the request of any other person primarily liable hereon, and such consent shall not alter nor diminish the liability of any person.

C-2

**DIEGO POPS, LLC**
**OPERATING AGREEMENT**
**dated as of March 1, 2014**

## EXHIBIT C

### FORM OF PROMISSORY NOTE
### FOR COMPANY BUY-OUT

#### (Continued)

No provision of this Note is intended to or shall require or permit Payee, directly or indirectly, to take, collect or receive in money, goods or in any other form, any interest (including amounts deemed by law to be interest) in excess of the maximum rate of interest permitted by applicable law. If any amount due from or paid by Maker shall be determined by a court of competent jurisdiction to be interest in excess of such maximum rate, Maker shall not be obligated to pay such excess and, if paid, such excess shall be applied against the unpaid principal balance of this Note, or if and to the extent that this Note has been paid in full, such excess shall be remitted to Maker.

This Note shall be binding upon Maker and his successors and assigns and shall inure to the benefit of Payee and his successors and assigns.

All notices required or permitted in connection with this Note shall be in writing and may be given in person or by United States mail, by commercial delivery service or by electronic transmission with verified receipt. Any notice directed to a party to this Note shall become effective upon the earliest of the following: (i) actual receipt by that party; (ii) delivery to the designated address of that party, addressed to that party; or (iii) if given by certified or registered United States mail, twenty-four (24) hours after deposit with the United States Postal Service, postage prepaid, addressed to that party at its designated address. The designated address of a party shall be the address of that party shown at the beginning of this Note or such other address as that party, from time to time, may specify by notice to the other parties.

This Note shall be governed by and construed according to the substantive laws of the State of Arizona, without regard to conflict of laws principles.

**MAKER:**

_____

C-3

**DIEGO POPS, LLC**
**OPERATING AGREEMENT**
**dated as of March 1, 2014**

## EXHIBIT D

### FORM OF PROMISSORY NOTE
### FOR MEMBER BUY-OUT

The form of Promissory Note is as follows:

### PROMISSORY NOTE

$_____                             Phoenix, Maricopa County, Arizona
                                              Dated: _____

        FOR VALUE RECEIVED, the undersigned, _____ _____(hereinafter called "Maker"), promises to pay to the order of _____, at _____ (together with all subsequent holders of this Note, hereinafter called "Payee"), or at such other mailing address as Payee may from time to time designate in writing, the principal sum of _____ AND 00/100 DOLLARS ($_____) plus interest at the rate of _____ per cent (___%) per annum, from the date hereof on the principal balance from time to time outstanding as hereinafter provided, and all other sums payable hereunder, to be paid in lawful money of the United States of America, as follows:

      A.     Sixty (60) equal, consecutive monthly payments of accrued interest and principal of $_____ due and payable on the _____ day of each month, commencing _____, and as of the _____ day of each month thereafter; and

      B.     The entire outstanding principal and all accrued but unpaid interest shall be due and payable in full on or before _____.

        All payments on this Note shall be applied first to the payment of any costs, fees or other charges incurred in connection with the indebtedness evidenced by this Note, then to the payment of interest and principal as described above.

        Maker shall have the option to prepay this Note, in full or in part, at any time, without penalty.

D-1

**DIEGO POPS, LLC**
**OPERATING AGREEMENT**
**dated as of March 1, 2014**

# EXHIBIT D

## FORM OF PROMISSORY NOTE
## FOR MEMBER BUY-OUT

### (Continued)

Time is of the essence of this Note. Upon the failure of Maker to pay any sum due and owing hereunder as provided herein within thirty (30) days of its due date, the Payee shall give the Maker written notice of any such default and a thirty (30) day period thereafter to cure the default (the "Curing Period"). If the Maker has not perfected a cure during the Curing Period (unless such failure cannot be reasonably cured within the Curing Period and the Maker has taken reasonable steps to cure such failure within the Curing Period and continues to pursue the curing of same until completed), at the option of Payee, the entire unpaid principal balance, all accrued and unpaid interest and all other amounts payable hereunder, shall become immediately due and payable, and the Payee may proceed against Maker in such manner as Payee, in his sole discretion, shall determine.

After maturity, including maturity upon acceleration, the unpaid principal balance, all accrued and unpaid interest and all other amounts payable hereunder, shall bear interest at that rate which is five percent (5%) above the rate that would otherwise be payable under the terms hereof. In addition, Maker shall pay all costs and expenses, including reasonable attorneys' fees and court costs, incurred in the collection or enforcement of all or any part of this Note. In the event of any court proceedings, court costs and attorneys' fees shall be set by the court and not by jury and shall be included in any judgment obtained by Payee.

Failure of Payee to exercise any option hereunder shall not constitute a waiver of its right to exercise the same in the event of any subsequent default or in the event of the continuance of any existing default after demand for strict performance hereof.

Maker, sureties, guarantors and endorsers hereof: (a) agree to be jointly and severally bound, (b) severally waive any homestead or exemption right against such debt, (c) severally waive demand, diligence, presentment for payment, protest and demand, and notice of extension, dishonor, protest, demand and nonpayment of this Note, and (d) consent that Payee may extend the time of payment or otherwise modify the terms of payment of any part or the whole of the debt evidenced by this Note, at the request of any other person primarily liable hereon, and such consent shall not alter nor diminish the liability of any person.

D-2

DIEGO POPS, LLC
OPERATING AGREEMENT
dated as of March 1, 2014

# EXHIBIT D

## FORM OF PROMISSORY NOTE
## FOR MEMBER BUY-OUT

### (Continued)

No provision of this Note is intended to or shall require or permit Payee, directly or indirectly, to take, collect or receive in money, goods or in any other form, any interest (including amounts deemed by law to be interest) in excess of the maximum rate of interest permitted by applicable law. If any amount due from or paid by Maker shall be determined by a court of competent jurisdiction to be interest in excess of such maximum rate, Maker shall not be obligated to pay such excess and, if paid, such excess shall be applied against the unpaid principal balance of this Note, or if and to the extent that this Note has been paid in full, such excess shall be remitted to Maker.

This Note shall be binding upon Maker and his successors and assigns and shall inure to the benefit of Payee and his successors and assigns.

All notices required or permitted in connection with this Note shall be in writing and may be given in person or by United States mail, by commercial delivery service or by electronic transmission with verified receipt. Any notice directed to a party to this Note shall become effective upon the earliest of the following: (i) actual receipt by that party; (ii) delivery to the designated address of that party, addressed to that party; or (iii) if given by certified or registered United States mail, twenty-four (24) hours after deposit with the United States Postal Service, postage prepaid, addressed to that party at its designated address. The designated address of a party shall be the address of that party shown at the beginning of this Note or such other address as that party, from time to time, may specify by notice to the other parties.

This Note shall be governed by and construed according to the substantive laws of the State of Arizona, without regard to conflict of laws principles.

**MAKER:**

_____

D-3

# EXHIBIT 3



**CHASE** 
JPMorgan Chase Bank, N.A.
P O Box 659754
San Antonio, TX 78265-9754

October 01, 2014 through October 31, 2014

Account Number:

| CUSTOMER SERVICE INFORMATION | |
| --- | --- |
| Web site: | **www.Chase.com** |
| Service Center: | **1-877-425-8100** |
| Deaf and Hard of Hearing: | 1-800-242-7383 |
| Para Espanol: | 1-888-622-4273 |
| International Calls: | 1-713-262-1679 |

00055401 DRE 601 141 30514 NNNNYNNNNNN T 1 000000000 63 0000
DIEGO POPS, LLC
7328 E STETSON DR
SCOTTSDALE AZ 85251-3406

## CHECKING SUMMARY
Chase Total Business Checking

| | INSTANCES | AMOUNT |
| --- | --- | --- |
| **Beginning Balance** | | |
| Deposits and Additions | | |
| Checks Paid | | |
| Electronic Withdrawals | | |
| Fees and Other Withdrawals | | |
| **Ending Balance** | | |

## DEPOSITS AND ADDITIONS

| DATE | DESCRIPTION | AMOUNT |
| --- | --- | --- |
| 10/21 | Fedwire Credit Via: First Bank And Trust East Texa/113122804 B/O: John H. Moon Longview TX 75604 Ref: Chase Nyc/Ctr/Bnf=Diego Pops, LLC Scottsdale, AZ 852513406/Ac-000000005373 Rfb=O/B First B&T Di Bbi=/Acc/15577 N Hayden Rd Ste 7 Scottsimad: 1021L1Lfb47C000013 Tm: 2226909294FI | $315,000.00 |
| **Total Deposits and Additions** | | **$315,000.00** |

## CHECKS PAID

# EXHIBIT 4



From: **Brooks Holcomb** brooks@bholcomblaw.com
Subject: RE: Bridge Ent. & Diego Pops Total Debt (Revised)
Date: March 9, 2016 at 6:26 PM
  To: Norma Dinh (N.Dinh@cakewalkmanagement.com) N.Dinh@cakewalkmanagement.com
  Cc: Chad Landau (c.landau@cakewalkmanagement.com) c.landau@cakewalkmanagement.com, rjocque@aol.com

Norma: Did you have a chance to get to this?

**From:** Brooks Holcomb
**Sent:** Wednesday, March 02, 2016 5:06 PM
**To:** Norma Dinh (N.Dinh@cakewalkmanagement.com)
**Cc:** Chad Landau (c.landau@cakewalkmanagement.com)
**Subject:** FW: Bridge Ent. & Diego Pops Total Debt (Revised)

Can you please update the attached sheet that you previously provided below? A few obvious updates/revisions are:

DP no longer owes LHH $35K, but instead owes an additional $35K to BKN Management
John Moon's $315K should not be listed as it is not a debt (it's a capital contribution already accounted for on the Schedule A to the Operating Agreement)
The monies owed to CW for mgt. fees may need to be updated

**From:** Norma Dinh [mailto:n.dinh@cakewalkmanagement.com]
**Sent:** Wednesday, December 23, 2015 4:27 PM
**To:** Ryan Jocque; Brooks Holcomb; Chad Landau
**Subject:** Bridge Ent. & Diego Pops Total Debt (Revised)

Please disregard the previous debt sheet I provided as there were a few errors. Attached is the revised doc.



Bridge Ent & Diego Pops
Debt.docx

# EXHIBIT 5



JOHN MOON

651113

**Schedule K-1**
**(Form 1065)**

# 2014

Department of the Treasury
Internal Revenue Service

For calendar year 2014, or tax
year beginning _____
ending _____

**Partner's Share of Income, Deductions,**
**Credits, etc.**                        ▶ **See separate instructions.**

| **Part III** | **Partner's Share of Current Year Income,** |
| | **Deductions, Credits, and Other Items** |

| | |
|---|---|
| **1** Ordinary business income (loss) | **15** Credits |
| −106,700. | |
| **2** Net rental real estate income (loss) | |
| | **16** Foreign transactions |
| **3** Other net rental income (loss) | |
| | |
| **4** Guaranteed payments | |
| | |
| **5** Interest income | |
| | |
| **6a** Ordinary dividends | |
| | **17** Alternative min tax (AMT) items |
| **6b** Qualified dividends | |
| | |
| **7** Royalties | |
| | **18** Tax-exempt income and |
| **8** Net short-term capital gain (loss) | nondeductible expenses |
| | |
| **9a** Net long-term capital gain (loss) | |
| **9b** Collectibles (28%) gain (loss) | **19** Distributions |
| **9c** Unrecaptured sec 1250 gain | |
| | **20** Other information |
| **10** Net section 1231 gain (loss) | |
| | |
| **11** Other income (loss) | |
| | |
| | |
| | |
| **12** Section 179 deduction | |
| | |
| **13** Other deductions | |
| | |
| | |
| **14** Self-employment earnings (loss) | |
| **A**           0. | |
| *See attached statement for additional information. | |

## Part I    Information About the Partnership

**A** Partnership's employer identification number

**B** Partnership's name, address, city, state, and ZIP code

DIEGO POPS, LLC
7328 E STETSON DR
SCOTTSDALE, AZ  85251

**C** IRS Center where partnership filed return
E-FILE

**D** □ Check if this is a publicly traded partnership (PTP)

## Part II    Information About the Partner

**E** Partner's identifying number

**F** Partner's name, address, city, state, and ZIP code

JOHN MOON
7181 E. CAMELBACK ROAD, #302
SCOTTSDALE, AZ  85251

**G** □ General partner or LLC        ☒ Limited partner or other LLC
member-manager                    member

**H** ☒ Domestic partner        □ Foreign partner

**I1** What type of entity is this partner?  INDIVIDUAL

**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here □

**J** Partner's share of profit, loss, and capital:

| | Beginning | Ending |
|---|---|---|
| Profit | 0.0000000% | 35.0000000% |
| Loss | 0.0000000% | 35.0000000% |
| Capital | 0.0000000% | 35.0000000% |

**K** Partner's share of liabilities at year end:

| | | |
|---|---|---|
| Nonrecourse | $ | 34,365. |
| Qualified nonrecourse financing | $ | 0. |
| Recourse | $ | 8,207. |

**L** Partner's capital account analysis:

| | | |
|---|---|---|
| Beginning capital account | $ | 0. |
| Capital contributed during the year | $ | 315,000. |
| Current year increase (decrease) | $ | −106,700. |
| Withdrawals & distributions | $( | ) |
| Ending capital account | $ | 208,300. |

□ Tax basis    ☒ GAAP    □ Section 704(b) book
□ Other (explain)

**M** Did the partner contribute property with a built-in gain or loss?
□ Yes    ☒ No
If "Yes", attach statement (see instructions)

For IRS Use Only

411261
11-24-14  LHA  **For Paperwork Reduction Act Notice, see Instructions for Form 1065.**    IRS.gov/form1065    **Schedule K-1 (Form 1065) 2014**

# EXHIBIT 6



**WILENCHIK & BARTNESS**

— A PROFESSIONAL CORPORATION —

ATTORNEYS AT LAW
The Wilenchik & Bartness Building
2810 North Third Street  Phoenix, Arizona  85004

Telephone:  602-606-2810     Facsimile:  602-606-2811

Dennis I. Wilenchik, #005350
Ross P. Meyer, #028473
admin@wb-law.com
*Attorneys for Plaintiff John Moon*

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

**IN AND FOR THE COUNTY OF MARICOPA**

| | |
|---|---|
| **CHAD LANDAU, et. al.,** | **Case No.: CV2018-007262** |
| **Plaintiffs,** | **DECLARATION OF JOHN MOON** |
| **vs.** | |
| **RYAN and CAITLIN JOCQUE, husband and wife,** | **(Assigned to the Honorable Daniel G. Martin)** |
| **Defendants.** | |

I, John Moon, make this Declaration of my own knowledge and I am competent to testify to the matters contained herein.

1. I, John Moon, am over 18 years of age.

2. I purchased thirty-five (35) membership interest points in Diego Pops, LLC, an Arizona limited liability company ("Diego Pops") on October 21, 2014 for $315,000.

3. I sold my thirty-five (35) membership interest points in Diego Pops on or around March 20, 2017 for $332,500.

4.     In late 2016 to early 2017, Ryan Jocque and I began discussing a potential buyout of my membership interest in Diego Pops.

5.     Jocque and I negotiated the terms of my buyout.

6.     During the time I was a member of Diego Pops, I never received a distribution.

7.     I did not receive a distribution from Diego Pops on or around February 21, 2017.

8.     Jocque did not disclose to me that distributions were issued and then voided on or around February 21, 2017.

9.     Jocque did not disclose that Diego Pops would be issuing distributions to members immediately after my membership interest was purchased.

10.     Had I known that Diego Pops planned to issue distribution checks, I would not have sold my membership interest in Diego Pops, because I would have received a significant distribution.

11.     Had I known that Diego Pops was successful enough to issue significant distributions, I would have held onto my membership interest, taken distributions, and then decided to sell or hold onto my membership interest as I would have understood Diego Pops had become a substantially profitable business.

12.     I declare under penalty of perjury that the foregoing is true and correct.

**EXECUTED** on _____12/16/2019_____.

DocuSigned by:

EA1AC6F4B4194A9...

_____

John Moon

WILENCHIK & BARTNESS

# EXHIBIT 7



**From:** Ryan Jocque <rjocque@aol.com>
**Sent:** Wednesday, February 15, 2017 3:10 PM MST
**To:** c.landau@cakewalkmanagement.com <c.landau@cakewalkmanagement.com>
**Subject:** moon

Chad,

I guess there is little to negotiate. Just have Moon agree to the following

- Immediate buyout of 100% of equity in Diego Pos and Montuak at original price invested
- 2 separate agreements
- 100K due to seller upon signing
- 12 months to pay remainder


Ryan Jocque
7328 E Stetson Drive
Scottsdale 85251

# EXHIBIT 8



## MEMBERSHIP INTEREST PURCHASE AGREEMENT

This Membership Interest Purchase Agreement (the "Agreement") is entered into as of March 15, 2017 (the "Effective Date"), by and between John Moon (the "Seller"), and Ryan Jocque ("Buyer").

**WHEREAS**, Seller currently owns a Thirty Five percent (35%) ownership interest in Diego Pops LLC, an Arizona limited liability company (the "Membership Interest"); and

**WHEREAS**, Seller desires to sell and Buyer desires to purchase the Membership Interest, on the terms and conditions set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the promises and the respective representations, warranties, covenants, and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, each intending to be legally bound, agree as follows:

### ARTICLE ONE
### PURCHASE AND SALE

**1.1** **Sale of Membership Interest**. Upon execution of this Agreement by all parties, Seller does hereby assign, grant, bargain, sell, convey, transfer and deliver to Ryan Jocque all of his right, title and interest in the Membership Interest, free and clear of all claim, liens and encumbrances. The transferred Membership Interest includes all claims, causes of action, or other rights whatsoever, whether known, unknown, suspected, contingent or fixed, liquidated or unliquidated, matured or un-matured, in law, equity or otherwise, arising out of or in any way related to the Membership Interest.

**1.2** **Purchase Price**. The total purchase price for the Membership Interest is *Three Hundred Thirty Two Thousand Five Hundred Dollars ($332,500.00)*.

**1.3** **Payment of the Purchase Price.** The Purchase Price shall be paid as follows:

(a) On or before March 20, 2017 - *One Hundred Seventeen Thousand Five Hundred Dollars ($117,500.00)* by bank check or wire transfer (the "Cash Payment").

(b) Upon execution of this Agreement by all parties, *Two Hundred Fifteen Thousand Dollars ($215,000)* payable in the form of a promissory note attached hereto as Exhibit 1, executed by Ryan Jocque as maker and Seller as Payee (the "Jocque Note").

**1.4** **Pledge**. To secure prompt payment in full when due (whether at stated maturity, by acceleration or otherwise) of the obligations under the Jocque Note, Ryan Jocque shall execute a pledge in the form attached hereto as Exhibit 3, pledging all of their respective right, title and interest in, to and under the Membership Interest.

**1.5** **Further Assurances**. The parties to this Agreement shall execute and deliver such additional documents and take such additional actions as any party or its counsel may reasonably deem to be practical and necessary or advisable in order to consummate the transactions contemplated by this Agreement and to vest more fully in Buyer the ownership of the Membership Interest.

### ARTICLE TWO
### SELLER'S REPRESENTATIONS AND WARRANTIES

Seller represents and warrants that the following are true and correct: (i) Seller holds of record, and owns beneficially, the Membership Interest, free and clear of any restrictions on transfer, taxes, security interests, options, warrants, purchase rights, contracts, commitments, equities, claims or demands (ii) The Membership Interest represents 100% of Seller's ownership interest in Diego Pops LLC, an Arizona limited liability company; (iii) This Agreement constitutes a legal, valid and binding obligation of Seller; (iv) The execution, delivery and performance of this Agreement do not, and the consummation of the transactions contemplated hereby and thereby shall not violate or result in a breach of any judgment, injunction, decree, restriction, ruling or order of any court or authority, domestic or foreign, or any laws; and (v) no consent, approval or authorization of, or registration or filing with, any authority is required in connection with the execution and delivery by Seller of this Agreement.

## ARTICLE THREE
## MISCELLANEOUS

3.1 **Amendment, Assigns.** This Agreement may be amended, modified or supplemented only by an instrument in writing executed by all of the parties to this Agreement. Except as otherwise provided herein, the provisions hereof shall inure to the benefit of, and be binding upon the successors and permitted assigns of the parties hereto.

3.2 **Survival of Representations, Warranties and Covenants.** All representations and warranties made in, pursuant to or in connection with this Agreement shall survive the execution and delivery of this Agreement.

3.3 **Entire Agreement.** This Agreement supersede all prior agreements and understandings relating to the subject matter hereof, except that the obligations of any party under any agreement executed pursuant to this Agreement shall not be affected by this section.

3.4 **Severability.** If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws effective during the term hereof, such provision shall be fully severable and this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision never comprised a part hereof; and the remaining provisions hereof shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom. Furthermore, in lieu of such illegal, invalid or unenforceable provision, there shall be added automatically as part of this Agreement, a provision as similar in its terms to such illegal, invalid or unenforceable provision as may be possible and be legal, valid and enforceable.

3.5 **Governing Law and Venue.** This Agreement shall be governed by, and construed in accordance with, the laws of the State of Arizona. If any action is brought to enforce or interpret this Agreement, venue for such action shall be in a court of appropriate jurisdiction in Maricopa County, Arizona.

3.6 **Captions, Counterparts.** The captions in this Agreement are for convenience of reference only and shall not limit or otherwise affect any of the terms or provisions hereof. This Agreement may be executed in counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. This Agreement shall be effective with the facsimile or electronic signature of any of the parties set forth below and the facsimile or electronic signature shall be deemed as an original signature for all purposes and the Agreement shall be deemed as an original for all purposes.

This Membership Interest Purchase Agreement entered into as of the date first above written.

BUYER:

Ryan Jocque

x _____

SELLER:
John Moon

x _____  3/20/14

**Confidential**        **JOCQUE 003365**

# EXHIBIT 9



**WILENCHIK & BARTNESS**
A PROFESSIONAL CORPORATION

ATTORNEYS AT LAW
The Wilenchik & Bartness Building
2810 North Third Street  Phoenix, Arizona  85004

Telephone:  602-606-2810      Facsimile:  602-606-2811

Dennis I. Wilenchik, #005350
Ross P. Meyer, #028473
admin@wb-law.com
*Attorneys for Plaintiff John Moon*

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| **CHAD LANDAU, et. al.,** | **Case No.: CV2018-007262** |
| **Plaintiffs,** | **DECLARATION OF CHAD LANDAU** |
| **vs.** | **(Assigned to the Honorable Daniel G. Martin)** |
| **RYAN and CAITLIN JOCQUE, husband and wife,** | |
| **Defendants.** | |

I, Chad Landau, make this Declaration of my own knowledge and I am competent to testify to the matters contained herein.

1. I, Chad Landau, and am over 18 years of age.

2. I am the only member and manager of Landau Holcomb Holdings, LLC, an Arizona Limited Liability Company.

3. In 2017, Landau Holcomb Holdings, LLC was a member of Diego Pops, LLC, an Arizona Limited Liability Company.

4. On or around February 21, 2017, Landau Holcomb Holdings, LLC was issued a distribution from Diego Pops, LLC.

5. At Ryan Jocque's direction, the February 21, 2017 distribution from Diego Pops, LLC was voided.

6. I declare under penalty of perjury that the foregoing is true and correct.

**EXECUTED** on December ⟨3⟩, 2019.

DocuSigned by:

_Chad Landau_

CF7813F8E0AD4DD...

Chad Landau

# EXHIBIT 10



Posting Date:20170321

Sequence Number:

Amount:$70,000.00

Account:

Routing Transit Number:

Check/Serial Number:000000002857

Bank Number:601

IRD Indicator:0

BOFD:000000000

Entry Number:

UDK:

Cost Center:

Teller Number:

Teller Sequence Number:

Missing Image:5

Processing Date: 20170322



DIEGO POPS, LLC
7154 E. STETSON DR., STE. 310
SCOTTSDALE, AZ 85251

CHASE
JPMorgan Chase Bank, N.A.
www.Chase.com
91-2/1221

2857

(2G)

3/21/2017

PAY TO THE
ORDER OF  Ryan Jocque                                                    $ **70,000.00

Seventy Thousand and 00/100*********************************************** DOLLARS

Ryan Jocque
7154 E. Stetson Dr., #310
Scottsdale, AZ 85251

DIEGO POPS, LLC

AUTHORIZED SIGNATURE

MEMO
Distribution

# EXHIBIT 11





**Liberty Mutual.**
INSURANCE

**NAMED INSURED:** DIEGO POPS LLC
**POLICY NUMBER:** BKS1556405821
**POLICY PERIOD:** 11/07/2014 to 11/07/2015
**REPORT DUE DATE:** 11/30/2015

This report includes the following Named Insured(s). Please indicate if any are inactive.

DIEGO POPS LLC
SCOTTSDALE ROAD RESTAURANT LLC

## OPERATIONS & OWNERSHIP

**Description of Operations:** (Please provide a detailed description of your company's operations)

MEXICAN FULL SERVICE RESTAURANT

Please describe who you sell your products and/or provide services to:
PUBLIC

Did you add or discontinue any operation(s) during the policy period? Yes ☐ No ☒
If yes, please explain below. Attach additional documentation as needed.

**Legal Status:**
☐ Corporation    ☐ Non-Profit Corporation    ☐ Partnership    ☐ Sole Proprietor    ☒ LLC    ☐ LLP    ☐ Closely Held Corporation

## OWNERSHIP INFORMATION:

| Name | Title | State | Duties Performed | Gross Payroll | # of Weeks Active | % Ownership |
|------|-------|-------|------------------|---------------|-------------------|-------------|
| Example: Bruce Smith | President | OR | Outside Sales | $100,000 | 52 | 10% |
| Ryan Jocove | Member/Man | AZ | Operations | | 52 | 35 |
| John Moon | Member | AZ | Passive | | 52 | 35 |
| Ray Oliver Holding LLC | Member | AZ | Passive | | 52 | 8 |
| Landon Holdings LLC | Member | AZ | Passive | | 52 | 8 |

Case 2:20-ap-00169-DPC    Doc 26-2    Filed 09/21/20    Entered 09/21/20 13:28:47    Desc
Exhibit 1 to Statement of Facts    Page 75 of 85

PHONE RESP         Policy #: BKS1556405821              Request ID: 109028         Page: 1 of 2

## NON-PAYROLL EXPOSURES:

For each classification listed, please provide the monthly exposure amount based upon the corresponding premium basis.

**16910 Restaurants-w/Alcoholic Bev Receipts <30%-w/Table Serv**
**4338 N Scottsdale Rd, Scottsdale, AZ 8525133**
Please provide: Dollars Of Gross Sales

| NOV 2014 | DEC 2014 | JAN 2015 | FEB 2015 | MAR 2015 | APR 2015 | MAY 2015 | JUN 2015 | JUL 2015 | AUG 2015 | SEP 2015 | OCT 2015 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 54,300 | 80,300 | 123,300 | 128,500 | 149,500 | 106,600 | 112,200 | 87,800 | 90,600 | 95,300 | 87,000 | 101,200 | 1,216,600 |

**58161 Liquor Liability**
**4338 N Scottsdale Rd, Scottsdale, AZ 8525133**
Please provide: Alcohol Sales

| NOV 2014 | DEC 2014 | JAN 2015 | FEB 2015 | MAR 2015 | APR 2015 | MAY 2015 | JUN 2015 | JUL 2015 | AUG 2015 | SEP 2015 | OCT 2015 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 22,900 | 32,000 | 49,700 | 53,400 | 60,300 | 40,200 | 43,500 | 30,500 | 30,800 | 31,700 | 27,800 | 33,300 | 456,100 |

**PREPARER INFORMATION**

Name: _____ Jocque _____   Title: Mem | Mgr

Signature: _____X_____   Date: 12|2|15

Email: RJOCQUE @ AOL.cm   Telephone #: 310.213.4971

Website: _____

☒ By checking this box, I consent to have the information on the forms disclosed to my Agent of record.

If you have any questions about this request, please contact your agent or you can reach us through:

**Customer Contact Center:**        Toll Free: 1-888-224-9246

Please return the completed documents by Email to CSIPREMAUDIT@libertymutual.com or
by fax to 1-877-409-1537 or by mail to Premium Audit Services, PO Box 66400, London, KY 40742.

**This report may be verified by an auditor of the company.**

Case 2:20-ap-00169-DPC   Doc 26-2   Filed 09/21/20   Entered 09/21/20 13:28:47   Desc
Exhibit 1 to Statement of Facts   Page 76 of 85

PHONE RESP        Policy #: BKS1556405821        Request ID: 109028        Page: 2 of 2

# EXHIBIT 12



**LANG & KLAIN, P.C.**
6730 N. SCOTTSDALE RD., SUITE 101
SCOTTSDALE, ARIZONA 85253-4408
TELEPHONE (480) 534-4900
*Please e-serve filings on:*
*Filing@lang-klain.com*

WILLIAM G. KLAIN, #015851
wklain@lang-klain.com *(not for e-service)*
KEVIN M. ESTEVEZ, #023913
kestevez@lang-klain.com *(not for e-service)*
JASON A. CLARK, #030765
jclark@lang-klain.com *(not for e-service)*
*Attorneys for Defendants*

### SUPERIOR COURT OF ARIZONA
### MARICOPA COUNTY

| | |
|---|---|
| CHAD LANDAU, an individual and on behalf of BRIDGE ENTERTAINMENT, LLC, an Arizona limited liability company; BKN INVESTMENTS, LLC, an Arizona limited liability company; BKN REAL ESTATE, LLC, an Arizona limited liability company; CS CHANDLER REAL ESTATE, LLC, an Arizona limited liability company; DIEGO POPS, LLC, an Arizona limited liability company; DIEGO POPS HOLDINGS, LLC, an Arizona limited liability company; SCOTTSDALE ROAD RESTAURANT, LLC, an Arizona limited liability company; JOHN MOON, an individual; EDUARDO ESCOBAR, an individual; D2W, LLC, an Arizona limited liability company; KAREN DORIS, LLC an Arizona limited liability company, | **Case No.: CV2018-007262** <br><br> **DEFENDANTS' RULE 26.1 INITIAL DISCLOSURE STATEMENT** <br><br> (Assigned to Hon. Daniel G. Martin) |
| Plaintiffs, <br> v. | |
| RYAN and CAITLIN JOCQUE, husband and wife, | |
| Defendants. | |
| RYAN and CAITLIN JOCQUE, husband and | |

wife,

                    Counterclaimants,

     v.

CHAD LANDAU, a single man,

                    Counterdefendants.

Defendants and counterclaimants Ryan Jocque ("Jocque") and Caitlin Jocque (collectively the "Jocques"), pursuant to Rule 26.1 of the Arizona Rules of Civil Procedure, hereby make the disclosures set forth below.

This is a preliminary disclosure statement, based on a good faith investigation of the Jocques' understanding of the dispute and the issues asserted therein. It contains information known to date but does not purport to represent all information that may exist that is or may later be determined to be relevant to the dispute in this case. It may be supplemented and amended with information learned through further investigation and discovery. *Clark Equip. Co. v. Ariz. Property & Casualty Ins.*, 189 Ariz. 433 (App. 1997). Nothing herein is an admission that the documents, testimony, or information disclosed herein is admissible.

## I.    Factual Bases for Claims and Defenses

This matter relates to certain business relationships between Plaintiff Chad Landau ("Landau"), Plaintiff John Moon ("Moon"), Plaintiff D2W, LLC ("D2W"), and Plaintiff Karen Doris, LLC ("Karen Doris") (collectively "Plaintiffs"), and Defendant Jocque that involve various entities. Plaintiffs' claims do not, however, arise from the actual operation of those business relationships. Instead, Plaintiffs' claims are based on wild and unfounded conspiracy theories that Landau has fabricated and stoked.

As reflected in his many stream-of-consciousness emails, the target of Landau's ire shifts regularly. For much of the parties' relationship, Jocque was, according to Landau, a "hero" and a "god," who "gave [Landau] his start and taught [Landau] his knowledge." Meanwhile, Moon was a "vicious and vindictive" "paranoid psycho" who was "FUCKING NUTS" and was "not making sober decisions based off facts," according to Landau. Moon, for his part, viewed

- 2 -

Case 2:20-ap-00169-DPC   Doc 26-2   Filed 09/21/20   Entered 09/21/20 13:28:47   Desc
Exhibit 1 to Statement of Facts   Page 79 of 85

Landau as "a thorn" for whom it was "time to put on the walking shoes and start over at a lower level of management." Indeed, the animosity between Moon and Landau is, upon information and belief, the reason that Landau manufactured the conspiracy theories upon which Plaintiffs' claims are based. It appears that Landau prefers attempting to position Jocque as a common enemy, over addressing the numerous issues that exist between Moon and Landau.

### A. The Parties

Jocque is a businessman and restaurateur with ownership interests in, and managerial positions with, various businesses in and around Scottsdale. Jocque first met Landau in or about 2005 or 2006, when Landau began working as a promoter for a nightclub in which Jocque had an ownership interest. Landau continued this work for approximately five years before resigning in or about 2010 to open his own nightclubs. Landau's independent ventures were, however, unsuccessful, and all closed in a few years.

In or about 2013, Landau approached Jocque about opening a late night diner in an available space located at 7158 E. 5th Avenue in Phoenix. Jocque did not see potential for another diner and, therefore, declined Landau's offer. Jocque was, however, interested in the location for a fast casual restaurant concept that he had developed. The concept centered around serving good-tasting, nutritious food that was crafted from whole ingredients. Ultimately, Jocque's concept became the Original Chop Shop and Landau was given the opportunity to become a member of the limited liability company that owned the restaurant.

As a result of the success of the Original Chop Shop, Jocque and Landau (along with others) subsequently became co-members (either directly or indirectly) of various other Arizona limited liability companies. These include the following companies (collectively the "Business Entities"), all of which are Plaintiffs in this action:

1. **BKN Real Estate, LLC** ("BKN Real Estate"), of which Jocque owns 50 percent and Karen Doris owns 50 percent.

2. **BKN Investments, LLC** ("BKN Investments"), of which Jocque owns 50 percent and Karen Doris owns 50 percent.

1  **3.  CS Chandler Real Estate, LLC** ("CSCRE"), of which Jocque owns 50
2  percent and BKN Real Estate owns 50 percent.

3  **4.  Scottsdale Road Restaurant, LLC** ("SRR"), of which Jocque owns 50
4  percent and BKN Real Estate owns 50 percent.

5  **5.  Diego Pops Holdings, LLC** ("DP Holdings"), which is owned entirely by
6  BKN Investments.

7  **6.  Bridge Entertainment, LLC** ("Bridge Entertainment"), which is owned
8  by: (1) Ryan Jocque, 42.5 percent; (2) William Asher, 27.5 percent; (3) URI Investments, 9.5
9  percent; (4) D2W, 7.5 percent; (5) Yianni, LLC, 6 percent; (6) Karen Doris, 5 percent; (7) Ray
10  Olivea Holdings, 1 percent; (8) MiCamp Solutions, LLC, 1 percent; and

11  **7.  Diego Pops, LLC** ("Diego Pops") is owned by: (1) Ryan Jocque, 70
12  percent; (2) Marcia Bower, 9.5 percent; (3) D2W, LLC, 7.5 percent; (4) Mr. Landau, 5 percent;
13  (5) Eduardo Escobar, 3 percent; (6) Brooks Holcomb, 3 percent; (7) MiCamp Solutions, LLC, 1
14  percent; (8) Leonard Bower, 1 percent.

15  According to Landau, any success that he experienced in the restaurant and/or nightclub
16  industry is attributable to Jocque.  Among other things, Landau has stated that:  (1) Jocque was
17  an individual that Landau "looked up to…like a hero;" (2) he "highly respected" Jocque; (3) he
18  had "a massive amount of respect and appreciation for everything [Jocque had] contributed as
19  the biggest difference maker and most valuable role [Jocque] play[ed] in this incredible
20  company;" (4) "we all know [R]yan [J]ocque is god;" (5) Jocque "gave [Landau] his start and
21  taught [Landau] his knowledge, which [Landau] will never forget; (6) he would "always look up
22  to [Jocque]; and (7) he wanted to be "a better partner in the future or just a better leader like
23  [Jocque]."   Indeed, in early 2017, Landau was begging "to just leave [his] cell phone behind
24  and take a trip with [Jocque] wherever."

25  Conversely, during the course of Jocque's and Landau's business relationship, Landau,
26  by his own admission, performed poorly in his roles as a member and/or manager of the
27  Business Entities.  Among other things, Landau admitted that he:  (1) was "a cocky overly

28

*Liquor Licenses and Control*, 162 Ariz. 415, 421, 783 P.2d 1207, 1213 (App. 1989) ("Generally, injurious falsehood is the publication of matter derogatory to the plaintiff's business which is calculated to prevent others from dealing with him.").

### III. Witnesses Expected to be Called at Trial

The Jocques are still assessing what persons with relevant knowledge may be necessary to testify at a trial. Accordingly, they have not made any final determinations as to hearing or trial witnesses. At this time, they are expected to call the following persons as witnesses at a hearing and/or trial:

> 1. Ryan Jocque
>    c/o Lang & Klain, P.C.
>    6730 N. Scottsdale Rd., Ste. 101
>    Scottsdale, AZ 85253
>    (480) 534-4900

Jocque is a defendant and counterclaimant in his individual capacity in this action. He will testify consistent with the facts described above in which he was involved or otherwise witness to regarding the dealings, documents, and history of the various business entities and his management thereof, as well as his interactions with Landau.

> 2. Caitlin Jocque
>    c/o Lang & Klain, P.C.
>    6730 N. Scottsdale Rd., Ste. 101
>    Scottsdale, AZ 85253
>    (480) 534-4900

Caitlin Jocque is a defendant and counterclaimant in this action. She will testify consistent with the facts described above in which she was involved or otherwise witness to regarding the management of the business entities and related monies, as well as her lack of engagement in any misappropriation of funds for non-business related expenses.

> 3. Norma Black

Ms. Black has worked as a bookkeeper for various of the Business Entities included as Plaintiffs in this action. She is expected to testify regarding her bookkeeping work, the operation of the various Business Entities, and the factual basis for the Jocques' defense in this matter.

- 24 -

13.     Adam Trenk
       Rose Law Group, Partner
       7144 Stetson Drive, Suite 300
       Scottsdale, AZ 85251
       (480) 240-5647

Mr. Trenk has worked as an attorney on behalf of John Moon and Landau, particularly regarding the negotiations over the Bridge Entertainment and Diego Pops buyouts. To the extent that the attorney-client privilege regarding his communications in these matters has been waived, he is expected to testify regarding the factual basis for the claims and defenses in this matter.

14.     Brooks Holcomb
       Brooks J. Holcomb, PLLC
       3103 South Fairfield Drive
       Tempe, AZ 85282-4020
       (602) 369-6961

Mr. Holcomb has been involved with the various Business Entities at times relevant to this dispute, including as general counsel. To the extent matters are not protected by the attorney-client privilege, Mr. Holcomb is expected to testify regarding the factual basis for the claims, defenses, and counterclaims in this matter.

15.     Chris Fox
       *Contact information unknown at this time*

Chris Fox has worked as an associate of Landau's during time periods relevant to this matter and been involved in various aspects of the operations of certain of the Business Entities. He is expected to testify as an adverse witness with respect to the factual basis for the claims, defenses, and counterclaims in this matter.

16.     Jon Shoop, CPA (or other representative of Skoda Minotti)
       Skoda Minotti, CPAs, Business & Financial Advisors
       3320 West Market Street, Suite 300
       Fairlawn, Ohio 44333
       (330) 668-1100

Skoda Minotti performed various tax-return and accounting services on behalf of certain of the Business Entities, and Landau at one point requested that Skoda Minotti perform a forensic audit of those entities. Mr. Schoop (or an appropriate alternate representative of Skoda

- 27 -

DATED this 16th day of July, 2019.

LANG & KLAIN, P.C.

By: _____
William G. Klain
Kevin M. Estevez
Jason A. Clark
*Attorneys for Defendants*

**ORIGINAL** mailed and emailed this same date to:

Robert T. Mills
Sean Anthony Woods
Jordan C. Wolff
Mills + Woods, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
rmills@millsandwoods.com
swoods@millsandwoods.com
jwolff@millsandwoods.com
*Attorneys for Plaintiffs John Moon, Eduardo*
*Escobar and D2W, LLC*

Andrew Ashworth
Gabriel & Ashworth, P.C.
10105 E. Via Linda, Suite 103, No. 392
Scottsdale, AZ 85258
Andrew@gabrielashworth.com
*Attorneys for Plaintiffs Chad Landau and Karen Doris, LLC*

Adriane J. Hofmeyr
Hofmeyr Law PLLC
31 N. 6th Avenue, Suite 105-466
Tucson, AZ 85701
Filings@hofmeyrlaw.com
Adriane@hofmeyrlaw.com
*Attorneys for Plaintiffs Chad Landau and Karen Doris, LLC*

By: /s/ Lisa Plisko _____

**VERIFICATION**

2     Under penalty of perjury, I declare as follows:

3     I am one of the defendants in this action. I have read the attached *Defendants' Rule*

4 *26.1 Initial Disclosure Statement* and am familiar with its content. I declare that its content

5 is true to the best of my personal knowledge, except as to those matters stated upon

6 information and belief, and as to those matters, I believe them to be true. Because I am not

7 an attorney, I make no declarations concerning the legal arguments made herein.

8     EXECUTED this _16_ day of July, 2019.

Ryan Jocque